# Illinois Official Reports

## Appellate Court

---

### *In re Zariyah A.*, 2017 IL App (1st) 170971

---

| | |
|---|---|
| Appellate Court Caption | *In re* ZARIYAH A., DeANGELO L., JAMES L., MIKYRA P., KAMAHRIE J., COURTNEY J., and MARTE J., Minors (The People of the State of Illinois, v. Ebony F., Respondent-Appellant).—*In re* ZARIYAH A., a Minor (The People of the State of Illinois, v. Merrill A., Respondent-Appellant).—*In re* AMARI A., a Minor (The People of the State of Illinois, v. Merrill A., Respondent-Appellant). |
| District & No. | First District, First Division<br>Docket Nos. 1-17-0971, 1-17-0974, 1-17-1059 cons. |
| Filed | December 29, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 14-JA-1388 through 14-JA-1394, 14-JA-1410; the Hon. Andrea M. Buford, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Amy P. Campanelli, Public Defender, of Chicago (Eileen T. Pahl, of counsel), for appellant Ebony F.<br><br>E. Madeline O'Neill, of Chicago, for other appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Mary P. Needham, and Nancy Kisicki, Assistant State's Attorneys, of counsel), for the People. |

Robert F. Harris, Public Guardian, of Chicago (Charles P. Golbert, Kass A. Plain, and Mary Brigid Hayes, of counsel), guardian *ad litem*.

Panel                JUSTICE MIKVA delivered the judgment of the court, with opinion. Presiding Justice Pierce and Justice Harris concurred in the judgment and opinion.

## OPINION

¶ 1    At issue here are the rules of evidence as they apply to adjudicatory hearings under the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2016)). These consolidated appeals involve eight minors ranging in age from 3 to 16 years old. Following an adjudicatory hearing, the trial court entered orders finding each of the minors was neglected, based on a lack of care and an injurious environment. And following dispositional hearings, the court found that Ebony F., the biological mother of seven of the eight minors, and Merrill A., the biological father of two of the minors, were unable and/or unwilling to care for the children. Ebony's seven biological children, including her daughter with Merrill, were adjudged wards of the court and placed under DCFS guardianship. The eighth minor—Merrill's other child—was placed in the care and custody of his biological mother.

¶ 2    On appeal, Ebony and Merrill challenge only the trial court's adjudication orders, arguing that the court's findings of neglect were against the manifest weight of the evidence and were influenced by the court's improper consideration of certain evidence including Ebony's admission that she used marijuana, hearsay evidence regarding the results of Ebony's mental health and substance abuse evaluations, and evidence of Ebony's unwillingness to participate in intact family services.

¶ 3    Merrill also argues that evidence of the family's involvement with DCFS and intact family services, prior to the time that Zariyah was born and Merrill and Amari came to live with Ebony and her other children, is irrelevant and should not have been considered in connection with the trial court's findings that Zariyah and Amari were neglected.

¶ 4    For the reasons that follow, we reverse the trial court's findings of neglect and remand for further proceedings consistent with this opinion.

¶ 5                I. BACKGROUND

¶ 6    Ebony F. is the biological mother of seven of the eight minors (Courtney J., Marte J., Kamahrie J., Mikyra P., James L., DeAngelo L., and Zariyah A.) in these consolidated appeals. Merrill A. is the biological father, with Ebony, of the minor Zariyah A. Merrill is also the biological father of the minor Amari A., with the biological mother Zivial J.

¶ 7    When the family first came to the attention of the Illinois Department of Children and Family Services (DCFS) in 2013, Ebony's six older children were living with her. Zariyah was born in early 2014, and sometime that same year, Merrill and Amari began living with Ebony and the other children.

¶ 8    In November 2014, all eight children were taken into protective custody, and the State filed petitions to adjudicate them wards of the court, alleging that the children were neglected, based on a lack of care and an injurious environment, and abused, based on a substantial risk of physical injury. The facts alleged in support of those petitions include the following:

> "On August 12, 2014 mother was involved in a domestic dispute with a family member who resides in the same apartment building. There is an ongoing issue of domestic violence between mother and this family member. On November 15, 2014 the mother was arrested due to violating an order of protection. Mother is currently incarcerated. On November 18, 2014 the family apartment was observed to be extremely cold. The apartment had no heat and no gas *** [W]ater pipes had burst in the building and had not been repaired. [Zariyah's] putative father stated that he had nowhere else to reside with this minor and minor's siblings. Minors are often left without adequate adult supervision. Mother and [Zariyah's] putative father admit to smoking marijuana. On November 18, 2014 minor and minor's siblings were observed to be dirty and unkempt."

¶ 9    In a supporting affidavit, DCFS investigator Priscilla Cash listed the following specific reasons why the children needed to be taken into protective custody: "Mom incarcerated; household where children living has no heat in the home. Father unable to make plan for his children. Children being supervise [*sic*] by the 13 year old."

¶ 10   The trial court conducted an adjudicatory hearing for all eight children on May 9, 2016. At the hearing, counsel for Ebony presented a motion *in limine*, joined in by Merrill, to bar all evidence of her involvement with intact family services on the grounds that, under section 2-10 of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-10 (West 2016)), evidence of a parent's acceptance of services cannot be treated as an admission of neglect or abuse. Ebony also argued that evidence of her participation, or lack of participation, in intact family services was irrelevant at the adjudicatory stage. The trial court denied the motion.

¶ 11   The following testimony and other evidence was presented at the adjudicatory hearing.

¶ 12              A. Initial DCFS Involvement—Summer and Fall of 2013

¶ 13   DCFS investigator Diane Hankle testified that she was assigned to the case in June 2013, in response to two hotline reports for inadequate supervision. Ms. Hankle visited Ebony's home on June 28, 2013, where Ebony was living with her six children—Ebony's youngest child, Zariyah, had not yet been born. Ms. Hankle described the home as "dirty." According to her, there were dog feces and urine in one of the bedrooms, the kitchen and bathroom were dirty, "[t]here were clothes all over the place," the children were sharing a single torn mattress on the floor, and a door had been placed over a broken window. Ms. Hankle also testified that "all of the children were dirty," wearing dirty clothes and looking as if they needed a bath. DeAngelo, the youngest, was wearing dirty underwear and "had some sort of bumps over him." When interviewed, the children indicated that the family had no hot water or working stove and that their mother had to take food next door to cook. But they stated that they had plenty to eat, bathed regularly, and could remember what they had for dinner. According to Ms. Hankle, four-year-old James and three-year-old DeAngelo told her that

- 3 -

Ebony sometimes left the children home alone, but this was contradicted by seven-year-old Kamahrie.

¶ 14    Ms. Hankle spoke to Ebony, who, according to Ms. Hankle, "said that she was stressed, and she had some depression," that this was affecting her "[i]n terms of not being able to get that house cleaned up," but that she was not taking medication or receiving mental health treatment at that time. Ms. Hankle said that Ebony expressed willingness to complete the services that Ms. Hankle mentioned to her, which included a "[s]ubstance abuse assessment, a mental health assessment, counseling and parenting classes." Ms. Hankle explained that the house was not safe for the children, and Ebony agreed to participate in safety planning, which called for the children to reside with a neighbor while Ebony cleaned up the home.

¶ 15    Ms. Hankle testified that she returned to the home a week later, on July 5, 2013, and, based on her observations, determined a safety plan was no longer needed. According to her:

> "A. It looked like a completely different house. It was clean. There was pictures on the wall. It smelled good. There was some furniture there. The window had been replaced. The broken windows had been replaced.
>
> Q. And had the feces and urine been removed?
>
> A. Absolutely."

At that time Ms. Hankle had also ordered beds for the children with "Norman funds"—funds provided to families with children who are at risk of being placed in DCFS care due to a lack of food, shelter, clothing, or other essential items (see *Norman Services: Information on Housing Advocacy, Cash Assistance and Other Services*, Ill. Dep't Children & Family Servs., https://www.illinois.gov/dcfs/lovinghomes/families/Documents/NormanServices.pdf (last visited Dec. 20, 2017))—which were due to arrive soon.

¶ 16    Based on the condition of the home during her initial visit, Ms. Hankle indicated allegations of environmental neglect and risk of harm. However, she found no credible evidence of inadequate supervision. When Ebony had to leave the house, she left the children in the care of her neighbor. Ms. Hankle's last involvement with Ebony was a transitional visit with intact family services worker Latonya Hale.

¶ 17                    B. Intact Family Services—Late 2013 and Early 2014

¶ 18    Ms. Hale was assigned to work with Ebony and her family in September 2013. Ms. Hale testified that when she first met Ebony on September 16, 2013, she told Ebony that the DCFS investigator had recommended "certain services for her, including a mental health assessment, parenting [classes], and [a] substance abuse screen[ing]." According to Ms. Hale, Ebony agreed to the mental health assessment, which she recalled discussing with Ms. Hankle, but said she was not aware of the other services and "wasn't going to do those services" because "she didn't feel it was needed." However, on September 25, 2013, Ms. Hale reiterated her recommendations to Ebony, and Ebony "agreed to comply with the services." Although Ms. Hale observed at that time that the cooking gas was turned off in the home, she also noted that Ebony had a two-burner electric stovetop that she used to cook and to heat hot water for bathing.

¶ 19    Ms. Hale next met with Ebony on October 3, 2013, to review service referrals and offer Ebony assistance with transportation. Ebony told Ms. Hale that her biological mother, Kimberly Holiday, whom she referred to as "Pony Girl," had a vendetta against her and "was

always causing problems for her and the children." The reports that Ms. Hale prepared indicated that it was Ebony's mother who called the hotline to report Ebony to DCFS. Ms. Hale walked around the home during this visit and testified that she "th[ought] the utilities were working on that date."

¶ 20    Ms. Hale testified that she initially made weekly visits to the home, both announced and unannounced. She stated that sometimes, even when a visit had been arranged in advance, no one would answer the door. By November 6, 2013, although Ebony told Ms. Hale that she had called one of the referrals and not received a call back, Ms. Hale said "no services engagement was taking place." Ms. Hale gave Ebony new referrals and went over them again with her. At this time, Ebony disclosed to Ms. Hale that she was pregnant and that the baby's father "was no longer in the picture." She also told Ms. Hale that the family's refrigerator was not working, and Ms. Hale agreed to try to obtain Norman funds to replace it.

¶ 21    On November 26, 2013, Ms. Hale drove Ebony to Ingalls Behavioral Health Center for a mental health assessment. When the State asked Ms. Hale what the outcome of that visit was, Ebony's counsel objected, and the following exchange took place:

> "[Assistant State's Attorney]: And what was the outcome of that assessment?
>
> [Ms. Hale]: The clinician confirmed—
>
> MS. GIPSON [(COUNSEL FOR EBONY)]: Objection, hearsay.
>
> THE COURT: Overruled. Go [a]head.
>
> MS. LOZA [(Assistant State's Attorney)]: You may answer.
>
> A. The clinician spoke with both of us, and she confirmed that mom's diagnosis was bipolar disorder NOS.
>
> MS. GIPSON: Continuing objection to the hearsay. Witness is testifying as to an out-of-court person's statement for the truth of the matter asserted. Mother would ask to strike that portion of the answer. That is hearsay.
>
> MS. LOZA: Would you like me to answer?
>
> THE COURT: Yes.
>
> MS. LOZA: Judge, at this point, this is relevant for the effect on the listener, not for the truth of the matter asserted, why mother might have needed some services, why this worker had acted in the way that she did after hearing this.
>
> THE COURT: Overruled. You can answer.
>
> THE WITNESS: Okay. The clinician explained to us the diagnosis of bipolar disorder NOS. She gave us the assessment report. She recommended mom to participate in their like outpatient hospital type mental health program, because she said she would be able to see a psychiatrist right away with doing that.
>
> Q. However, was there an issue with mom participating in that service?
>
> A. Yes. At the time, mom had Harmony Insurance, and the program, the outpatient program at Ingalls didn't accept Harmony.
>
> MS. GIPSON: Judge, I could ask, for the record, for the Court to note mother's continuing objection to the answer with regards to the clinician's statements as hearsay.
>
> THE COURT: Thank you."

¶ 22     Ms. Hale went on to explain that the clinician gave Ebony a list of mental health care providers that would accept her insurance and Ms. Hale reiterated to Ebony the importance of following up with those referrals. That day, Ms. Hale also helped Ebony schedule an appointment for a substance abuse assessment because Ebony reported that she was having trouble getting through to the treatment center. Ebony told Ms. Hale that she felt she could take care of her children and did not need parenting classes.

¶ 23     On November 27, 2013, Ms. Hale visited the older children at their school. She testified that they appeared to be "safe and appropriate." She also observed the family's home, noting that the heat was off but that Ebony had one or more space heaters in the home "so the areas of the home was warm." Ms. Hale recalled that Ebony said that it was her mother downstairs who had turned the gas off "just out of spite or something to that effect." Ms. Hale discussed with Ebony measures she should take to use the heaters safely. At that time, Ebony requested bus fare so that she could see about a financial assistance program that would help her get the heat back on in the home. Ms. Hale testified that her organization could not help with this directly because the utility bill was in Ebony's mother's name. During this visit, Ms. Hale had Ebony sign a refusal for parenting services and write why she felt that she did not need them. Ebony agreed at that meeting to follow up with a mental health service provider.

¶ 24     On December 9, 2013, Ms. Hale drove Ebony to Healthcare Alternative Systems (HAS) for a substance abuse assessment. When the State asked Ms. Hale about the outcome of that visit, counsel for Ebony again objected, and the trial court again overruled the objection. The following exchange took place:

> "[Assistant State's Attorney]: And what was the outcome of that assessment?
>
> MS. GIPSON [(counsel for Ebony)]: Objection, Judge. I believe that the answer that the witness intends to give will go into hearsay.
>
> THE COURT: Overruled.
>
> THE WITNESS [(Ms. Hale)]: The substance abuse counselor who completed the assessment and the drug test confirmed mom—
>
> MS. GIPSON: Objection, Judge.
>
> THE WITNESS: —was positive for—
>
> MS. GIPSON: Objection, Judge.
>
> THE COURT: Hold on if you hear an objection.
>
> MS. GIPSON: Objection with regard to hearsay. The witness is again testifying to the out-of-court statements made by a party—made by an individual who is not a party. It is for the truth of the matter asserted. It is hearsay. Mother would ask the Court to note a continuing objection to the nature of the testimony given by the witness with regards to what she was informed by the various service providers.
>
> THE COURT: Continuing objection noted. You can answer.
>
> THE WITNESS: The counselor explained that mom tested positive for marijuana, which was also stated in the report that she submitted to the agency, and she recommended outpatient services for mom."

¶ 25     Ms. Hale testified that, on the day of the substance abuse assessment, Ebony admitted to Ms. Hale that she had used marijuana. Following the assessment, Ebony agreed to participate in an outpatient substance abuse program at HAS that included a parenting component.

¶ 26 On December 23, 2014, Ms. Hale again observed that the space heaters were keeping the home warm and again cautioned Ebony to monitor them, which Ebony agreed to do. At this time Ebony told Ms. Hale that she had missed some days of her outpatient programming at HAS because HAS was out of bus fare cards. Ebony requested cards from Ms. Hale's organization, but they had also run out.

¶ 27 However, on January 24, 2014, Ebony asked to sign a refusal of services. Ms. Hale explained the consequences of doing so, that "if she gets another indicated case, she runs a higher risk of having her case screened in with the State's Attorney to have her children recommended for foster care." Ms. Hale saw the children on that date, and they again appeared "safe and appropriate." Although Ms. Hale testified that she "believe[d] the utilities were working" at that time, she also testified that the family was still using space heaters. Ebony told Ms. Hale that she suspected her mother of "tampering with the valves or doing something with the boiler, because everything was downstairs, and her mother was downstairs." However, at that time, the gas was on in the home, and the family had hot water.

¶ 28 Ms. Hale's final visit with Ebony was on February 1, 2014. According to Ms. Hale, the purpose of the visit was "[t]o just close out the case, review the final service plan, just to kind of reiterate things with mom, encourage her to follow through with services." By that point Ebony was eight months pregnant with Zariyah and told Ms. Hale that she didn't have the energy to engage in services but would follow up with them after she had the baby.

¶ 29 On cross-examination, Ms. Hale acknowledged that intact family services are voluntary. Counsel for Ebony went through each of Ms. Hale's visits with the family with her, including a number of one-on-one conversations she had with each of the six children. Ms. Hale agreed that on these visits she saw food in the home and observed no signs of abuse, that the children "appeared to be well," that they were "neatly and appropriately groomed" and dressed appropriately for the weather, and that they did not report any concerns to her about their home.

¶ 30 On both November 27 and December 5, 2013, the children told Ms. Hale that they were keeping warm. And Ms. Hale testified that she personally observed on December 23, 2013, and January 24, 2014, that the space heaters or "fire place heaters" Ebony was using were keeping the apartment warm. At Ms. Hale's last visit on February 1, 2014, Ebony told Ms. Hale that she had followed up with public aid and been approved for a Link card and cash assistance. Ms. Hale decided to close the case and leave the children in Ebony's care because "[t]here were no issues of abuse or neglect while [Ms. Hale] observed the children." At that time, although all of the utilities were connected, the family was still using space heaters because the radiant heaters in the home were not working.

¶ 31 At no time did Ms. Hale witness a paramour living with the family, the children told her their mother did not have a boyfriend, and Ebony told Ms. Hale that she became pregnant before DCFS involvement began and was no longer with the father. From September 2013 to February 2014, Ms. Hale never saw Merrill or Amari living with the family.

¶ 32 At this time, counsel for Merrill objected to any use of the testimony of Ms. Hankle or Ms. Hale in connection with his children, Zariyah and Amari, who were not physically present in the home during the periods of time that those witnesses observed the home or met with Ebony. At the State's request, the court postponed ruling on the objection until after all witnesses had testified. But the court never ruled on the objection.

¶ 33                    C. Events Leading to Protective Custody—Fall 2014

¶ 34            The State's last witness, DCFS investigator Priscilla Cash, testified that she was assigned
        to the case in August 2014, in response to a hotline report of inadequate supervision. By that
        time, Ebony had given birth to Zariyah and was living in the home with all seven of her
        children, as well as Zariyah's father, Merrill; Merrill's teenage son, Amari; and Amari's
        teenage half-sister Alexis J., who is not Merrill's biological child and is not part of these
        proceedings.

¶ 35            Ms. Cash testified that, during her first visit with the family, on September 2, 2014,
        Merrill and the children reported that Ebony was incarcerated. According to Ms. Cash,
        Ebony was released some time before Ms. Cash's visit on September 30, 2014. In the
        intervening month, Ms. Cash saw the minors several times, and they appeared to be well and
        were well groomed. The children reported that they were never left alone. Courtney told Ms.
        Cash that, whenever Ebony was in jail, Merrill or Alexis or one of the children's older
        cousins would take care of them. Ms. Cash observed that the children again did not have beds
        and was told that the family had been forced to dispose of the beds due to an infestation of
        bed bugs.

¶ 36            By October 2014, Ms. Cash had delivered new beds to the family and was "looking to
        unfound the case" because the children's basic needs were being met and "they did not
        appear to be at any imminent risk at that time." In one of their final conversations, Ebony
        thanked Ms. Cash for all she had done for the family.

¶ 37            However, when Ms. Cash visited the home again on November 18, 2014, Merrill, who
        was there with three of the younger children, told Ms. Cash that Ebony and her mother had
        "gotten into it again" and that Ebony's mother had called the police and had Ebony arrested.
        According to Ms. Cash, "[i]t was freezing cold outside, and it felt like it was colder in the
        house than it felt outside." Merrill told her that "the gas was not working in the home at that
        time because [ ] the pipes were [sic] burst." Ms. Cash observed an electric heater in the
        master bedroom, where the children were, but observed that the room was still cold. She
        recalled that the children were not clean, one of them had a runny nose, and there was "very
        limited food" in the apartment. Ms. Cash told Merrill that the house was too cold for the
        children to remain there. She testified that she "was trying to give him an opportunity" and
        gave him until later that day to identify a warm place for the children to stay but that, when
        she checked back with him later that day, "he was saying he really didn't have a place" for
        the children to go. She acknowledged that she did not identify any shelters or warming
        centers that he could take the children to.

¶ 38            Ms. Cash further testified that, although Merrill at first denied using drugs, when she
        asked him what would happen if she "was to drop him right now," he admitted that he had
        smoked marijuana. Ms. Cash never made any referrals for services to Merrill.

¶ 39            Ms. Cash also visited the older children at their school on November 18, 2014. According
        to her, "they were dirty that day," a couple of them "had pretty bad body odors," and "[t]heir
        hair was not combed." Ms. Cash interviewed Courtney, who told her that, although the house
        was cold, the bedroom was kept warm and that Courtney's grandmother "had her mom
        locked back up." Courtney indicated that, since Alexis had recently run away from home,
        when Ebony and Merrill were not present, 13-year-old Amari would take care of the
        children. When Ms. Cash interviewed Amari, he stated that his father took good care of him.

He confirmed that he sometimes watched the other children, "along with a 15 or 16-year-old cousin" who "sometimes help[ed]."

¶ 40    Ms. Cash acknowledged on cross-examination that she was not able to identify how often Alexis or Amari watched the younger children, that she did not ask the children what period of time the teens provided that care, and that "it could have been five minutes" or "it could have been five hours."

¶ 41    Ms. Cash then spoke to Ebony by telephone. Ebony told her that she and Merrill were trying to get the pipes fixed and get the house fixed up but that her mother would not allow anyone to enter the basement to work on the pipes. Ebony believed that she would be released from jail on December 2, 2014.

¶ 42    Ms. Cash saw Merrill at the children's school later on November 18, 2014, and learned that he had taken the two youngest children, Zariyah and DeAngelo, to the home of Shannon Lewis. When Ms. Cash went to Ms. Lewis's home she saw that it was a warm, safe place. In fact, Amari and Zariyah were placed in Ms. Lewis's home after the children were taken into protective custody and Ms. Lewis was deemed to be a suitable caretaker for them. Ms. Cash further acknowledged that when she spoke to Ebony that day, Ebony advised her that it was okay for the children to stay at Ms. Lewis's house. Ms. Cash nevertheless took the children into protective custody. When asked why, she said it was her supervisor's decision, "[s]omeone made the critical decision for [her] to do that," and "[she] did what [she] was told." When asked on cross-examination if she advised her supervisor that Merrill had found a warm, safe place for the children to stay, Ms. Cash stated, "I don't know what I told her. I don't remember. It's almost two years ago."

¶ 43    In Ms. Cash's view, the children were at a substantial risk of harm "[b]ased on the environment that the children were in, the children being left with a 13-year-old, reports that there was domestic violence going on" between Ebony and her mother, as well as Ebony's failure to address her substance abuse and mental health issues. The allegations of inadequate supervision she stated were based on "the children being left with a 13-year-old." When asked for the basis for the allegations of environmental neglect, Ms. Cash stated:

> "Very limited food. The source of electricity as far as the children were concerned. The children were in a very, very cold environment due to pipes being burst in the basement. I was trying to get down in the basement. I'm sure there was mold in the house and everything else."

¶ 44    The trial court admitted into evidence, over Ebony's objection, five documentary exhibits presented by the State. The first of the State's exhibits was a certified statement of conviction indicating that Ebony pleaded guilty to a misdemeanor charge of domestic battery, in that Ebony knowingly or intentionally caused bodily harm to a family or household member, Ms. Holiday, by pushing her to the ground on August 12, 2014.

¶ 45    The State also introduced documents created by Ms. Hale—an integrated assessment (IA) report dated November 4, 2013, and family service plans dated November 4, 2013, December 20, 2013, and January 28, 2014—that tracked the testimony Ms. Hale provided at the adjudicatory hearing.

¶ 46    In the IA report, Ms. Hale stated that Ebony "was cordial toward [Ms. Hale] and expressed her willingness to participate in intact services,"[1] but that Ebony "disagreed with needing some of the services" that were recommended to her. According to Ms. Hale's report, although Ebony "admitted to past marijuana use," she "denied any substance abuse issues." Ms. Hale also noted that Ebony and her biological mother, Ms. Holiday, had "a very conflictual [*sic*] relationship most of the time."

¶ 47    However, Ms. Hale made clear in her report that each of the children appeared to be "affectionately bonded" with Ebony and received "the most support and nurturance" from her. Ms. Hale believed that Ebony was capable of taking care of her children, stating:

> "Ebony appears to have the capacity to provide an appropriate level of monitoring for her children. Allegations of inadequate supervision were previously made against Ebony but those allegations were all unfounded.
>
> * * *
>
> Ebony is able to self transport and access resources within her community. She takes care of her children's daily needs and ensures that they attend school regularly. Also at the onset of her current DCFS involvement, Ebony made a care plan for her children and addressed the issues of environmental neglect in her home which brought the case to the attention of DCFS."

¶ 48    Ms. Hale concluded her report by predicting that the family would remain intact but that Ebony needed to follow through with mental health and drug assessments, and that parenting classes were "also recommended *** as an added support."

¶ 49    In a family services plan also dated November 4, 2013, Ms. Hale stated that Ebony "admitted to having mental health concerns that contributed to the state of the home" and "acknowledged that her home environment had been neglected" but that she also "denied any substance abuse issues[,] *** made a care plan for her children[,] and cleaned up the home before their return." Ms. Hale also noted that Ebony was "constantly getting into disturbances with Ms. Holiday, which "required police intervention."

¶ 50    In a subsequent family services plan dated December 20, 2013, Ms. Hale noted that although "there were multiple weeks that the family was not available when [Ms. Hale] attempted to conduct home visits *** [Ebony] ha[d] recently been making herself more available." By January 28, 2014, she wrote that "the minors appear[ed] well in the mother's care and attend[ed] school regularly" but that Ebony had refused further intact family services and had asked for her case to be closed. Ms. Hale indicated that her next task would be to "prepare closing paperwork as directed by [her] supervisor since [Ebony] refused to continue with services."

¶ 51    The State rested, and the trial court denied motions for directed findings filed by both Ebony and Merrill.

¶ 52    Ebony presented a single witness, Linda Jelks, a teaching assistant at Metcalfe Elementary School, where Ebony's five oldest children attended school. Ms. Jelks testified that she saw the children every day during the 2014 school year and had conversations with James, who was in kindergarten, every day because she worked in his classroom. She had

---

[1]Portions of Ms. Hale's report and service plan written in all capital letters have been quoted here in ordinary type for readability.

previously worked for two months in Kamahrie's classroom and still spoke with Kamahrie "quite often, maybe two to three times a week." She saw the other children around the school at lunch or during recess. Ms. Jelks also observed Ebony drop the children off at the school at least two or three times a week. Ms. Jelks reported that the children always appeared clean and washed to her and never told her that they were hungry or needed clothes.

¶ 53                                          D. Closing Arguments and Findings of Neglect

¶ 54      In its closing argument, the State asked the trial court to find that each of the children was neglected, based on an injurious environment and a lack of care, and abused, based on a substantial risk of injury. The State emphasized the deplorable conditions of the home when DCFS first became involved in June 2013 and the testimony of intact family case worker Latonya Hale, who the State said "had problems with mom for the entirety of the case" because "[m]other fought services from day one." In particular, the State emphasized Ms. Hale's testimony regarding Ebony's mental health and drug assessments:

> "However, mother did do a mental health assessment. She was diagnosed with bipolar—She was diagnosed bipolar at that time, and she was to follow up with outpatient mental health services and was given a long list of providers which the caseworker spoke to her about, and—none of which the mother followed up with. Mother also did a substance abuse assessment, which she was driven there, and she tested positive for marijuana. Mother admitted to having used marijuana while pregnant with Zariyah. She was recommended for outpatient services that included parenting, and she never finished that program."

¶ 55      The court-appointed guardian *ad litem* (GAL) adopted the State's closing argument, adding that by the time Ms. Cash visited the home November 18, 2014, "[t]here were ongoing issues with lack of heat" and "it was freezing in the home." The GAL acknowledged that the family was able to clean up the "deplorable conditions" first observed in the home on June 28, 2013, but noted that the reason Ebony gave for those conditions, that she was "overwhelmed" and "depressed," was never addressed through her participation in recommended services. Like the State, the GAL emphasized the results of Ebony's mental health and drug abuse assessments:

> "So they recommended a mental health assessment for [Ebony], and it wasn't until the intact worker—I think she made, like, 16 attempts, she testified to, to try to get mom into the services. She actually went and picked [Ebony] up, took her to the mental health assessment, and they did determine at that time that [Ebony] had bipolar disorder and needed treatment. And [Ebony]—from that time on until the—until protective custody was taken in December of 2014, there was never any mental health follow-up for [her]. That placed the children at risk, and it made them neglected, your Honor.
>
> *** [T]he intact worker tried to get her to go to a substance abuse assessment. She finally went and picked her up, took her to the substance abuse assessment, which recommended outpatient drug treatment for [Ebony], and she admitted to the worker at the time when she was pregnant with [Zariyah], that she was smoking marijuana and, in fact, did end up with a positive drop for marijuana yet *** never followed up with any kind of substance abuse treatment."

The GAL emphasized that it was the combination of problems, "housing issues, substance abuse issues, hygiene-of-the children issues, lack of supervision, mental health issues, legal issues," that together amounted to a lack of care and an injurious environment.

¶ 56 Counsel for Ebony characterized the case as "a knee-jerk reaction by DCFS to take the children," a decision she insisted was inconsistent with the actual observations of the investigators who were involved with the family. She pointed out that the poor conditions DCFS first observed in 2013 were immediately corrected and argued that Ebony's later refusal of services was not relevant. Ebony's counsel stated: "Essentially what the case is about is an attack on the parents' poverty; that because they were poor and because they needed the space heaters, that they were unable—that they were somehow unable to parent their children."

¶ 57 Counsel for Merrill additionally noted that DCFS never actually referred him to any services and asked the court to disregard the family's "long history" referenced by the State because the State had not established when Merrill joined the household.

¶ 58 In rebuttal, the State again emphasized Ebony's bipolar diagnosis and refusal of services:

"And when she got—when she was taken for the mental health assessment, it was found out that mother was in fact, bipolar, and she was not following up with outpatient mental health services. She was, therefore, not going to the therapy, not going to a psychiatrist. She was not getting any medication. She—The minors were in substantial abuse, substantial risk of—sorry—they were in substantial risk of injury because mother was not doing what she should have been doing. She was not taking parenting. In fact, she refused all services."

¶ 59 On August 1, 2016, the trial court entered separate orders finding each of the children was neglected, as defined in section 2-3 of the Juvenile Court Act, based on a lack of necessary care (705 ILCS 405/2-3(1)(a) (West 2016)) and an injurious environment (705 ILCS 405/2-3(1)(b) (West 2016)). The court refused to make a finding of abuse as to any of the children. In finding neglect, the court noted in each of the eight adjudication orders that one basis was that Ebony had stated that she was depressed and had been diagnosed as bipolar but had not followed up with mental health services.

¶ 60 The trial court also stressed this basis at the close of the hearing:

"The mom admitted to being stressed and depressed. She also admitted to using marijuana. The mom failed to do intact services despite numerous offers. *The only thing she was able to complete was a mental health assessment where she was found to have bipolar disorder. The mother did not do any of the follow-up services.* The mother has been in jail on at least two occasions between June 2013 and December of 2014." (Emphasis added.)

¶ 61 Following dispositional hearings in the spring of this year, the trial court also entered orders finding Ebony and Merrill unable and/or unwilling to care for the children. Amari was placed in the care and custody of his mother, and the other seven children were adjudged wards of the court and placed under DCFS guardianship.

¶ 62 In appeal No. 1-17-0971, Ebony challenges the trial court's adjudication orders for her biological children, arguing both that the court's findings of neglect based on a lack of care and an injurious environment were against the manifest weight of the evidence, and that in making those findings, the court improperly relied on certain evidence, including (1) Ebony's

admission of marijuana use made in connection with those services, (2) hearsay evidence regarding her mental health diagnosis and drug use, and (3) her unwillingness to engage in voluntary intact family services.

¶ 63 Merrill adopts these same arguments in his appeals (appeal Nos. 1-17-0974 and 1-17-1059), which challenge the trial court's adjudication orders for his two biological children, Zariyah and Amari. Merrill also argues that the trial court improperly relied on evidence relating to the family's living conditions when his children were not physically present in the home.

¶ 64                                    II. JURISDICTION

¶ 65 The trial court entered disposition orders on March 15 and April 17, 2017. These orders encompassed the trial court's earlier findings, made on August 1, 2016, that the children were neglected, based on a lack of care and an injurious environment. See *In re Barion S.*, 2012 IL App (1st) 113026, ¶ 36 ("In juvenile cases, an adjudicatory order is generally not considered a final appealable order. [Citation.] Rather, the dispositional order is regarded as final and appealable as of right and the proper vehicle to appeal a finding of abuse or neglect."). Ebony timely filed her notice of appeal in appeal No. 1-17-0971 on April 13, 2017, and Merrill timely filed his notices of appeal in appeal Nos. 1-17-0974 and 1-17-1059 on April 12 and April 21, 2017, respectively. We thus have jurisdiction over these appeals pursuant to Illinois Supreme Court Rules 301 and 303, governing appeals from final judgments in civil cases, and Rule 660(b), governing appeals from final judgments in child protection proceedings under the Juvenile Court Act. Ill. S. Ct. R. 301 (eff. Feb. 1, 1994); R. 303 (eff. Jan. 1, 2015); R. 660(b) (eff. Oct. 1, 2001).

¶ 66 We note that, although Illinois Supreme Court Rule 662 (eff. Oct. 1, 1975) provides that an adjudication order may be treated as a final and appealable order if a disposition order is not entered within 90 days of adjudication and that a notice of appeal must be filed within 30 days after the expiration of that 90 days, that Rule "has never been amended to reflect the current procedure under the Juvenile Court Act," which calls for an adjudication of wardship to occur at the dispositional hearing, and not the adjudicatory hearing. *In re Barion S.*, 2012 IL App (1st) 113026, ¶ 39. As we have noted before, Rule 662 has no application under the current procedures, and appeals from findings of abuse or neglect made at the adjudicatory hearing are timely, so long as they are filed within 30 days of the court's disposition order. *Id.*

¶ 67                                    III. ANALYSIS
¶ 68                                    A. Timeliness
¶ 69 Before we address the issues raised on appeal, we find it appropriate to first discuss the timing of our decision. This is an accelerated appeal pursuant to Illinois Supreme Court Rule 311(a) (eff. Mar. 8, 2016). Subsection (a)(5) of that rule provides that we are required to issue our decision within 150 days after the filing of the notice of appeal, except where good cause is shown. Here, although Merrill and Ebony's notices of appeal were filed on April 12 and 13 of this year, making our decisions due by September 9 and 10, 2017, multiple extensions of time were requested by the parties, and we revised the briefing schedule to accommodate not only those requests but additional briefing and oral argument, which took place on November 29, 2017. These three appeals were also initially consolidated on May

19, 2017, but then partially severed at Ebony's request on June 9, 2017. However, in the course of considering this case, we determined that certain dispositive issues affect all eight minors and reconsolidated the three cases on July 24, 2017. Under these circumstances, we find good cause for issuing our decision after the 150-day deadline contemplated by Rule 311(a)(5).

¶ 70                                B. Procedural Framework for the Issues on Appeal

¶ 71     The Juvenile Court Act establishes the procedures by which a minor may be removed from his or her parents and made a ward of the court. Upon the filing of a petition for wardship by the State, an initial custody hearing is held, at which the trial court determines whether probable cause exists to believe that the minor is neglected, abused, or dependent. 705 ILCS 405/2-10(1)-(2) (West 2016). After the temporary custody hearing, an adjudicatory hearing is held to determine whether a preponderance of the evidence demonstrates that the minor is abused, neglected, or dependent. 705 ILCS 405/1-3(1), 2-21(1) (West 2016). Following a finding of abuse, neglect, or dependency, the trial court must then conduct a dispositional hearing (*In re G.F.H.*, 315 Ill. App. 3d 711, 715 (2000)) to determine whether it is in the minor's best interest to be made a ward of the court and, if so, to hear evidence regarding what disposition will best serve "the health, safety and interests of the minor and the public" (705 ILCS 405/2-22(1) (West 2016)). Unlike at the dispositional hearing, where the trial court may consider "[a]ll evidence helpful" to a determination of the best interests of the child (705 ILCS 405/2-22(1) (West 2016)), at the adjudicatory hearing the rules of evidence apply (705 ILCS 405/2-18(1) (West 2016)).

¶ 72     On appeal, Ebony and Merrill argue that the trial court's findings of neglect were against the manifest weight of the evidence and were improperly based on the court's consideration of inadmissible evidence, including Ebony's admission that she used marijuana, hearsay evidence regarding the results of Ebony's mental health and substance abuse evaluations, and evidence of Ebony's unwillingness to participate in intact family services.

¶ 73     Merrill also argues that the testimony of DCFS and intact family services workers whose only interactions with the family occurred before Zariyah was born and before Merrill and Amari came to live with Ebony should not have been considered in connection with the trial court's findings that Zariyah and Amari were neglected.[2]

¶ 74                                C. Evidence Considered by the Trial Court

¶ 75     We first consider Ebony's arguments, joined in by Merrill, that in reaching its findings of neglect, the trial court relied on inadmissible evidence.

---

[2] Although, under "Issues Presented for Review," Merrill additionally indicates that he is challenging the trial court's finding "that it was in the best interest of the minor Amari A. to be adjudged a ward of the court," as well as its finding that Merrill is "unable and unfit to care for the minor," Merrill has included nothing in the body of his brief to support any challenge to the trial court's disposition orders. The issues are forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Jan. 1, 2016). In addition, in the fact section of his brief, Merrill expressly states "A[s] Appellant-Father, Merrill A. agrees that placement of Amari with his mother Zvial [*sic*] J., father presents no argument regarding the dispositional phase of the hearing regarding Amari."

- 14 -

¶ 76                                    1. Ebony's Admission of Marijuana Use

¶ 77        Ebony first argues that it was error for the trial court to allow into evidence Ms. Hale's
testimony that Ebony admitted to Ms. Hale that she had used marijuana. Ebony contends that
this evidence was not admissible because the record demonstrates that she "would not have
reasonably understood that her admission made during voluntary intact services could be
used to show that her children were neglected." In support of this argument, Ebony cites two
cases holding that, "[t]o be valid, an admission in a Juvenile Court Act proceeding must be
intelligently and voluntarily made; that is, it must be apparent from the record that the party
making the admission was aware of the consequences of his admission." *In re Johnson*, 102
Ill. App. 3d 1005, 1012 (1981); see also *In re M.H.*, 196 Ill. 2d 356, 366 (2001) (citing
*Johnson*, 102 Ill. App. 3d at 1012-13).

¶ 78        But in both of the cases that Ebony relies on, the admission in question was not an
admission by the parent of having engaged in certain conduct but instead a dispositive,
in-court admission regarding the ultimate issue that was the subject of the proceeding. In
*Johnson*, the father of a minor entered an admission that the minor was neglected, based on
his stipulation to all of the facts alleged in the State's petition for adjudication. *Johnson*, 102
Ill. App. 3d at 1009. On appeal, we determined that nothing in the record demonstrated that
his "admission was intelligently or voluntarily made and that he understood the consequences
of his admission," *i.e.*, "that a finding of neglect gives the court jurisdiction [over] the minor
who then becomes subject to the dispositional powers of the court." *Id.* at 1013. Where the
State's petition sought only "temporary custody" and "other appropriate relief" (internal
quotation marks omitted), it was not clear that the father understood that his admission could
ultimately lead to the loss of his parental rights. *Id.*

¶ 79        And in *M.H.*, 196 Ill. 2d at 365-66, our supreme court adopted the reasoning in *Johnson*
and extended it to a termination of parental rights hearing, holding that a trial court must
determine whether a factual basis exists for a parent's admission of unfitness before
accepting the admission.

¶ 80        Notably, in *Johnson* we relied on *In re Beasley*, 66 Ill. 2d 385, 393 (1977), in which our
supreme court held that for a court to accept an admission of guilt in a juvenile delinquency
proceeding, it must be apparent from the record that the minor understands the consequences
of his or her admission. Although proceedings under the Juvenile Court Act are civil, rather
than criminal, in nature, the *Beasley* court based its holding on the requirement, set out by the
United States Supreme Court in *Boykin v. Alabama*, 395 U.S. 238, 242 (1969), that a guilty
plea may only be entered in a criminal case where the record shows that the defendant has
"an affirmative awareness of [its] consequences." *In re Beasley*, 66 Ill. 2d at 392.

¶ 81        Ebony cites no authority applying the rule in these cases outside the context of a guilty
plea or other dispositive, in-court admission of the State's allegations, where a parent
essentially waives the right to a hearing. We reject Ebony's argument that her out-of-court
admission of marijuana use is comparable to such a scenario or that the out-of-court
statements of parents in juvenile proceedings should as a rule be treated differently than the
out-of-court statements of any other parties in civil cases or, for that matter, statements made
by criminal defendants while not in custody. See *People v. Clay*, 211 Ill. App. 3d 291, 302
(1990) (noting that "[a]ny statement by an accused person, unless excluded by the privilege
against self-incrimination or other exclusionary rules, may be used against him as an
admission" (citing *People v. Howell*, 53 Ill. App. 3d 465 (1977))).

¶ 82    Ebony also argues that, because she was required to admit her drug use in order to effectively participate in substance abuse treatment, her admission to using marijuana is barred by section 2-10 of the Juvenile Court Act, which provides that "[a]cceptance of services shall not be considered an admission of any allegation in a petition made pursuant to th[e] Act." 705 ILCS 405/2-10(2) (West 2016). We have recognized that, for it to be effective, therapy or treatment may require a respondent to make incriminating disclosures (see *In re L.F.*, 306 Ill. App. 3d 748, 754 (1999)). However, we reject Ebony's argument that this kind of admission becomes inadmissible under section 2-10 of the Juvenile Court Act.

¶ 83    The plain language of section 2-10 creates a very narrow prohibition; the *act* of accepting and engaging in services may not be construed as an admission of the State's allegations. Section 2-10 says nothing about the admissibility of actual admissions made during the course of such treatment, whether or not those admissions are necessary for the treatment to be effective. We decline Ebony's invitation to broaden the scope of that section beyond its plain language.

¶ 84    In sum, Ebony's out-of-court statement to Ms. Hale regarding her marijuana use was admissible, pursuant to Illinois Rule of Evidence 801(d)(2) (eff. Oct. 15, 2015), as a statement by a party-opponent, and the trial court did not err in relying on it as evidence in support of its findings of neglect.

¶ 85            2. Hearsay Evidence Regarding Ebony's Mental Health Diagnosis and Drug Use

¶ 86    Ebony also argues that the trial court abused its discretion by admitting and relying on hearsay evidence concerning the results of her mental health and substance abuse assessments. Ebony asserts that, over her objection, the State elicited hearsay testimony from intact family case worker Latonya Hale and that, although the State represented to the court that the testimony was only offered to show Ms. Hale's course of conduct with respect to her referral of services to Ebony, in their closing arguments both the State and the GAL relied on the testimony for the truth of the matter asserted. Ebony argues that she was prejudiced because the trial court expressly referenced her bipolar diagnosis as a basis for its findings of neglect. Merrill joins in this argument to the extent that these same references were made in connection with the court's findings that his two children, Zariyah and Amari, were also neglected minors.

¶ 87    The State and the GAL do not dispute that they referenced Ebony's bipolar diagnosis and marijuana use in their closing arguments and that this was also referenced by the trial court in its rulings but insist that other, non-hearsay evidence in the record—including documentary evidence and Ebony's own statements—formed a non-hearsay basis for those remarks and for the court's findings of neglect. Because we conclude, as discussed *supra*, that Ebony's own statements were admissible as evidence of her marijuana use, we agree with the State and the GAL in reference to Ebony's use of marijuana and need only consider whether hearsay statements were impermissibly used to argue and find that Ebony was bipolar.

¶ 88    We are mindful that, unlike at a dispositional hearing, where any helpful evidence "may be admitted and may be relied upon to the extent of its probative value" (705 ILCS 405/2-22(1) (West 2016)), the normal rules of evidence apply at an adjudicatory hearing (705 ILCS 405/2-18(l) (West 2016)). Under the rules, " '[h]earsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered into evidence to prove the truth of the matter asserted" (Ill. R. Evid. 801(c) (eff. Oct. 15, 2015)) and is generally not

admissible unless a specific exception applies (Ill. R. Evid. 802 (eff. Jan. 1, 2011)). "However, testimony about an out-of-court statement which is used for a purpose other than to prove the truth of the matter asserted in the statement is not 'hearsay.' " *People v. Williams*, 181 Ill. 2d 297, 313 (1998). "Statements that are offered to show their effect on [a] listener or to explain the listener's subsequent course of conduct," for example, are not considered hearsay. *People v. Sangster*, 2014 IL App (1st) 113457, ¶ 76.

¶ 89    That an out-of-court statement may explain a listener's course of conduct, however, does not mean that the *contents* of the statement are admissible without limitation. Instead, courts must balance "the need to show course of conduct *** against potential prejudice" to the opposing party. *People v. Vincent*, 92 Ill. App. 3d 446, 457 (1980). Thus, "out-of-court statements that explain a [person's] course of conduct should be admitted only to the extent necessary to provide that explanation and should not be admitted if they reveal unnecessary and prejudicial information." *People v. O'Toole*, 226 Ill. App. 3d 974, 988 (1992). For example, in criminal cases we have held that, "[t]o establish his course of conduct, a police officer may testify that he had a conversation with an individual and that he subsequently acted on the information received," but "cannot testify as to the substance of his conversation with the individual because that would be inadmissible hearsay." *People v. Johnson*, 199 Ill. App. 3d 577, 582 (1990).

¶ 90    In their briefs, the State and the GAL argue that the admission of Ms. Hale's testimony regarding the substance of her conversation with the mental health clinician was, at most, harmless error because there was properly admitted documentary evidence in the record from which the trial court could have concluded that Ebony was bipolar. It is true that the erroneous admission of hearsay evidence is harmless error where it is merely cumulative of other, properly admitted, evidence in the record. *Johnson*, 199 Ill. App. 3d at 583; see also *In re A.B.*, 308 Ill. App. 3d 227, 237 (1999) (holding that testimony about client service plans by witnesses with only secondhand knowledge of those contents, though inadmissible, was "mere surplusage," where the plans themselves were entered into evidence and provided sufficient support for the trial court's findings). However, we do not agree with the State and the GAL that other evidence presented at the adjudicatory hearing in this case provided a non-hearsay basis for the trial court's finding that Ebony was diagnosed with bipolar disorder.

¶ 91    The State first points to Ebony's initial admission to Ms. Hankle in 2013 that "she was stressed, and she had some depression," which affected her ability to keep the house clean. However, these statements are plainly insufficient to establish that the hearsay evidence of Ebony's bipolar diagnosis was cumulative. A lay person's recognition that she is "stressed" or "ha[s] some depression," is not the equivalent of a clinical diagnosis by a trained medical professional of bipolar disorder.

¶ 92    The GAL also relies on two documents, neither of which provides admissible evidence of Ebony's bipolar diagnosis. The November 4, 2013, IA report prepared by Ms. Hale states, under the "Parent/Guardian Interview" section, that "Ebony did admit to being diagnosed with bipolar depression." The report further states, under "Mental/Emotional History," that "Ebony disclosed that she was diagnosed in the past with bipolar depression" and "she is currently not in treatment but mentioned that she participated in counseling before." A family services plan prepared by Ms. Hale on December 20, 2013, provides Ms. Hale's written account of the same information she relayed on the witness stand: "Ebony recently

- 17 -

completed a mental health assessment at Ingalls. She was given a provisional diagnosis of bipolar D/O NOS. She was stated to be at a low risk of harm but it was recommended that she follow up with outpatient psych services to help stabilize her mood."

¶ 93 Although the GAL contends that these documents were properly admitted as business records under section 2-18(4)(a) of the Juvenile Court Act (705 ILCS 405/2-18(4)(a) (West 2016)), even if we agree that the foundational requirements of that section were met, that argument could only address the first layer of hearsay—the document itself. In the case of the IA report, a second layer of hearsay—Ebony's out-of-court statements to Ms. Hale—likely comes within the exception, under Rule 801(d)(2) (Ill. R. Evid. 801(d)(2) (eff. Oct. 15, 2015)), for admissions by a party-opponent. But for each of the documents, the statement ultimately relied upon to establish Ebony's diagnosis is the out-of-court statement of an unidentified medical professional who purportedly relayed the diagnosis, in the first instance, to Ebony herself, at an undisclosed time and place and under unknown circumstances, and in the second instance, to Ms. Hale following Ebony's mental health assessment in this case. These documents were also hearsay to the extent that the GAL now wishes to rely on them for the truth and accuracy of a diagnosis that Ebony suffered from bipolar disorder.

¶ 94 In sum, we cannot agree that the erroneous admission of Ms. Hale's testimony regarding Ebony's diagnosis was harmless error because it was merely cumulative of other, competent, evidence.

¶ 95 3. Evidence of Ebony's Unwillingness to Engage in Intact Family Services

¶ 96 Ebony additionally argues that the trial court erred by denying her motion *in limine* and admitting, over her counsel's repeated objections, evidence regarding her unwillingness to participate in or complete intact family services. Ebony contends both that consideration of such evidence is expressly prohibited by the Juvenile Court Act and that it is necessarily irrelevant to a court's determination of whether affected minors are neglected or abused as defined by the Act.

¶ 97 As with the argument we reject in part C.1, *supra*, Ebony's statutory argument again rests on section 2-10 of the Juvenile Court Act (705 ILCS 405/2-10 (West 2016)). Whether a statutory provision places limits on the type of evidence that may be introduced in a particular proceeding is a matter of statutory construction that we review *de novo*. *Solon v. Midwest Medical Records Ass'n*, 236 Ill. 2d 433, 439 (2010). As noted above (*supra* ¶ 78), section 2-10 of the Juvenile Court Act provides that "[a]cceptance of services shall not be considered an admission of any allegation in a petition made pursuant to this Act" (705 ILCS 405/2-10 (West 2016)). That provision goes on to provide that "nor may referral of services be considered as evidence in any proceeding pursuant to this Act, except where the issue is whether [DCFS] has made reasonable efforts to reunite the family." 705 ILCS 405/2-10 (West 2016). The plain language of section 2-10 refers only to the *acceptance* of services by a parent and the *referral* of services by a social worker. It makes no mention of a parent's refusal of services. And even evidence regarding the acceptance of services is not barred by the provision. Rather, section 2-10 of the Act makes it clear that such evidence simply cannot be deemed an admission regarding the need for the accepted services. We disagree with Ebony that, as a matter of law, section 2-10 of the Act bars evidence that a parent has refused services.

¶ 98    We consider separately whether such evidence was relevant to the trial court's finding that these minors were neglected, bearing in mind that the relevance and admissibility of evidence are matters within the trial court's discretion, and we will only reverse its findings where there is an abuse of that discretion. *People v. Garcia*, 2012 IL App (2d) 100656, ¶ 17. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011).

¶ 99    We agree with Ebony that a parent's refusal to participate in referred intact family services, no matter how unnecessary or unrelated to the facts that brought the case into court those services may be, is not automatically relevant to a finding of abuse or neglect. However, we also agree with the State and the GAL that, where evidence is presented supporting a finding of environmental neglect based on a specific problem—like an untreated mental health disorder or substance abuse—evidence regarding whether or not the parent engaged in services intended to remedy that problem is indeed relevant at the adjudicatory hearing.

¶ 100    The cases Ebony relies on do not convince us otherwise. Both involve evidence of participation in services that took place *after* the petition was filed and the minor was removed from the home, and they stand only for the proposition that evidence of a parent's substantial completion of offered services does not negate the parent's initial failing that triggered State intervention at the time of temporary custody and the filing of the petition. *In re S.W.*, 342 Ill. App. 3d 445, 451 (2003); *In re Kenneth D.*, 364 Ill. App. 3d 797, 804 (2006). These cases stand for the proposition that a parent's participation in services *after* the petition has been filed is not relevant to the allegations in a petition for wardship, which relate only to whether the minor was abused or neglected at the time he or she was taken into temporary custody. *Id.* They have no application here, where the evidence at issue relates to Ebony's refusal of services prior to the petition being filed. We reject Ebony's argument that the refusal to participate in intact family services can never be relevant at an adjudicatory hearing. Indeed, this court recently relied on such evidence to affirm findings of neglect in a child protection case. In *In re Adam B.*, 2016 IL App (1st) 152037, ¶ 36, we noted that the mother's failure to provide necessary medical care for her children, "*as well as her noncompliance with intact services*" (emphasis added) constituted sufficient evidence that all the minors were abused due to a substantial risk of physical injury and neglected due to an injurious environment.

¶ 101    However, the services refused must be services that the evidence demonstrates have some connection to the problems in the home. Because the State failed to present any non-hearsay evidence establishing that Ebony suffered from a specific mental health disorder necessitating treatment—or at least some ongoing symptoms affecting her ability to care for her children that treatment would be likely to address—it failed to establish a foundation for the relevance of the evidence that Ebony refused such treatment. Although Ebony admitted at one point to being too stressed and depressed to clean her house, the house was clean a week later. Evidence of Ebony's refusal to participate in mental health services should have been accompanied by a showing, based on competent evidence, that she needed those services.

¶ 102    Conversely, because Ebony admitted to using marijuana while she was pregnant with Zariyah, evidence of her refusal to receive substance abuse treatment was at least marginally relevant, and we do not find the trial court to have abused its discretion in admitting that

evidence. We note, however, as discussed in our review of the evidence as a whole, that the State failed to present any evidence regarding the frequency of that use or establishing that the children witnessed or were otherwise affected by Ebony and Merrill's marijuana use.

¶ 103                    D. Harmless Error Based on the Sufficiency of Other Evidence

¶ 104    As discussed above, in their briefs the State and the GAL argued that the admission of Ms. Hale's testimony regarding Ebony's bipolar diagnosis was, at most, harmless error because it was cumulative of other evidence establishing that diagnosis. However, at oral argument in this court, the State and the GAL focused on a different harmless error argument, insisting that—even if certain evidence was improperly admitted—the trial court's ultimate findings of neglect were amply supported by other admissible evidence unrelated to Ebony's diagnosis and should therefore be affirmed. We find this argument lacks merit.

¶ 105    We do not do so, however, based on *People v. Dennis*, 181 Ill. 2d 87 (1998), or *People v. Coleman*, 129 Ill. 2d 321 (1989), the cases relied on by Ebony. *Dennis* involved an instructional, not an evidentiary, error, and it is not clear that the standard the court applied in that case is applicable outside of that context. See *Dennis*, 181 Ill. 2d at 107 (holding that "[i]n order for an alleged *error in instructions* to be considered harmless, it must be demonstrated that the result of a trial would not have been different if the proper instruction had been given" (emphasis added)). And *Coleman* involved a violation of the defendant's constitutional rights (*Coleman*, 129 Ill. 2d at 340), an error for which our supreme court has acknowledged there is "a somewhat higher bar *** to be deemed harmless" (*In re E.H.*, 224 Ill. 2d 172, 180 (2006)).

¶ 106    An evidentiary error not affecting a constitutional right is harmless where there is "no *reasonable probability*" that the result would have been different absent the error. (Emphasis in original.) *Id.* The argument advanced by the State and the GAL, that we should disregard the erroneously admitted evidence in this case and consider whether the remaining evidence still supports the trial court's rulings, is one that our supreme court considered in *Gunn v. Sobucki*, 216 Ill. 2d 602 (2005). As the court in that case explained, "[i]t is true that not every defect in trial court proceedings requires reversal of the judgment. Where a case is tried by the court without a jury, as this one was, error in the admission of evidence is not grounds for reversal so long as there is sufficient competent evidence fairly tending to support the trial court's judgment." *Id.* at 612-13. This is the proposition for which the State cited a decision of this court, *In re Estate of Michalak*, 404 Ill. App. 3d 75, 95 (2010).

¶ 107    However, in *Gunn* our supreme court went on to state a further consideration not addressed in *Michalak* that "[a] new trial should be ordered only when the evidence improperly admitted appears to have affected the outcome of the trial." *Gunn*, 216 Ill. 2d at 613. We know that improperly admitted evidence affected the outcome of a trial where, as in *Gunn*, the remaining evidence was insufficient to support the trial court's judgment. *Id.* at 614-16.

¶ 108    But we also know it where, as here, the trial court itself made plain that it relied on the inadmissible evidence. Although it is true that "[w]hen the trial court is the trier of the facts, a reviewing court presumes that the judge considered only admissible evidence and disregarded inadmissible evidence in reaching his conclusion" (*People v. Cannon*, 150 Ill. App. 3d 1009, 1016 (1978)), that presumption "may be rebutted where the record affirmatively shows the contrary" (*People v. Gilbert*, 68 Ill. 2d 252, 258-59 (1977)). Here, the

trial court specifically referred to Ebony's bipolar diagnosis and failure to engage in mental health services, both in its written adjudication orders and on the record at the conclusion of the adjudicatory hearing. Under these circumstances, we cannot say the error was harmless.

¶ 109                    E. Evidence of Events Prior to Zariyah and Amari Living in the Home

¶ 110    In addition to adopting Ebony's arguments on appeal, Merrill also maintains that the testimony given by Ms. Hankle and Ms. Hale was inadmissible as to his biological children, Zariyah and Amari, who did not live in the home with Ebony and the other children during the time periods described by those witnesses. Although the trial court never ruled on Merrill's objection to this testimony, he argues that it clearly relied on the challenged testimony to find that Zariyah and Amari were neglected. This argument is forfeited, both because Merrill failed to secure a ruling on his evidentiary objection (see *Fremont Compensation Insurance Co. v. Ace-Chicago Great Dane Corp.*, 304 Ill. App. 3d 734, 741-42 (1999) ("it is [a] party's obligation to secure a ruling on [his] objection, and the failure to obtain such a ruling operates as a waiver [(forfeiture)] of the objection")) and because he includes in his brief no citations to relevant legal authority in support of this argument (see Ill. S. Ct. R. 341(h)(7) (eff. Jan. 1, 2016) (noting that argument shall contain citation to authorities relied on and "[p]oints not argued are waived")).

¶ 111    Even if it the argument were not forfeited, we would find it lacked merit. To be relevant, evidence need only have a tendency to make the existence of any material fact more probable than it would otherwise be. Ill. R. Evid. 401 (eff. Jan. 1, 2011). Evidence regarding the past conditions of the family's home and the care Ebony provided her other children, while not conclusive, was at least relevant to whether Zariyah and Amari, who later came to live in that same home with Ebony, were neglected based on a lack of care or exposure to an injurious environment.

¶ 112                                F. Sufficiency of the Evidence

¶ 113    In addition to her evidentiary arguments, for which Ebony asks us only to remand this case for a new adjudicatory hearing, Ebony separately urges us to reverse the trial court's findings of neglect outright, insisting that they were against the manifest weight of the evidence. However, we conclude that remand, and not outright reversal, is the proper result in this case because we agree with the State and the GAL that, based on the evidence that was presented, the court's findings of neglect were not against the manifest weight of the evidence.

¶ 114    It is important to note that, when considering Ebony's request that we reverse, rather than remand, we consider *all* of the evidence that was before the trial court. *People v. Lopez*, 229 Ill. 2d 322, 367 (2008); see also *Timothy Whelan Law Associates, Ltd. v. Kruppe*, 409 Ill. App. 3d 359, 365 (2011) ("We will not strike [the] improperly admitted evidence, reweigh the balance of the evidence, and render a decision."). Here, that includes the hearsay evidence of Ebony's bipolar diagnosis and the related evidence of her refusal to participate in mental health treatment.

¶ 115    We acknowledge that the poor conditions of the family's home observed by Ms. Hankle in June 2013 were immediately remedied to the satisfaction of DCFS. And, as Ebony points out, the State failed to link either parent's marijuana use to ongoing effects on the children's environment or care. But, in addition to the impermissible hearsay evidence of Ebony's

mental health diagnosis there was, for example, evidence of an ongoing domestic dispute between Ebony and Ms. Holiday that had resulted not only in Ebony's incarceration on more than one occasion but in an inability to provide the home with consistently working heat for nearly a year. Although we agree with Ebony that no one circumstance of this case, standing alone, would be sufficient to support a finding of neglect, in our view the evidence as a whole was such that the trial court's finding of neglect was not against the manifest weight of the evidence.

¶ 116   We remand for further proceedings consistent with this opinion.

¶ 117   We note that, in response to this court's concerns regarding unnecessarily disrupting the present placement of the minors, the parties all advised the court at argument of their understanding that, absent a further order of the trial court, the children will remain in their current placements pending a new adjudicatory hearing.

¶ 118                                    IV. CONCLUSION

¶ 119   We conclude that it was improper for the trial court to base its findings of neglect on hearsay evidence that Ebony was diagnosed with bipolar disorder. Without this foundation, evidence that Ebony refused to receive mental health treatment lacked relevance and was also inadmissible. Because it is not evident that the trial court would have reached the same result without this improperly considered evidence, we cannot say that the net effect of these errors was harmless. However, because we conclude that, based on the evidence that was presented, the trial court's finding of neglect was not against the manifest weight of the evidence, we remand for a new adjudicatory hearing.

¶ 120   Reversed and remanded.