2021 IL App (2d) 200161-U
No. 2-20-0161
Order filed August 17, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| JASON MANASTER AND HILLARY MANASTER, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | No. 14-CH-2484 |
| SONDRA BERNFIELD, individually and as Trustee of the SONDRA BERNFIELD LIVING TRUST Dated May 27, 1997, GLEN BERNFIELD Individually, and COLDWELL BANKER RESIDENTIAL REAL ESTATE, LLC d/b/a COLDWELL BANKER RESIDENTIAL BROKERAGE, | ) ) ) ) ) ) ) ) | |
| | ) ) | Honorable Daniel L. Jasica, |
| Defendants-Appellees. | ) | Judge, Presiding. |

JUSTICE BRENNAN delivered the judgment of the court.
Justices Jorgensen and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:  At a combined jury and bench trial, the trial court's evidentiary rulings and choice of jury instructions did not constitute an abuse of discretion. The judgments in favor of the defendant home sellers and the brokerage company were not against the manifest weight of the evidence. Also, the trial court correctly determined that the Consumer Fraud Act did not apply to the defendant home sellers. Affirmed.

¶ 2    Following an eight-day combined jury and bench trial, the jury and the trial court found against plaintiff home buyers, Jason and Hillary Manaster, and in favor of defendant home sellers, Sondra Bernfield, individually and as trustee of the Sondra Bernfield Living Trust, Glen Bernfield, and their brokers Coldwell Banker, LLC, d/b/a Coldwell Banker Residential Brokerage, on all seven counts.  Each of the counts turned on defendants' alleged failure to disclose two material defects: sloped floors in the east wing and a water infiltration problem in the basement.  The trial court determined that the sloped floors were not a material defect and, to the extent the water infiltration problem was a material defect, defendants reasonably believed that it had been corrected.  The Manasters now appeal five of the seven counts, arguing that the judgments in favor of defendants were against the manifest weight of the evidence.  They also challenge several of the trial court's discretionary rulings, including its decision to allow Glen Bernfield to testify to his conversations with a handyman and a plumber, to bar feedback from an unnamed broker, to refuse two non-Illinois Pattern Jury Instructions (non-IPI), and to issue a *Prim* instruction (*People v. Prim*, 53 Ill. 2d 62 (1972)).  For the reasons that follow, we affirm.

¶ 3                                I. BACKGROUND

¶ 4    In October 2013, Bernfield[1] prepared to put his family home of 28 years, 2070 Partridge Lane in Highland Park, on the market.  He knew that the floors in the east wing were sloped by approximately 1 to 2 inches, but he believed that this was due to normal settling.  He also knew that the basement took in water following heavy rains, and, on October 3, 2013, he hired Pasquesi Plumbing to address the problem.

---

[1] All references to Bernfield are Glen Bernfield, age 78 in 2013.  Sondra Bernfield suffered from advanced Parkinson's disease and was excused from testifying at trial.

¶ 5    On October 29, 2013, Bernfield, an attorney, completed the property disclosure report. He checked "no" to the following items: "I am aware of material defects in the walls or floors"; "I am aware of flooding or recurring leakage problems in the crawlspace or basement"; "I am aware of material defects in the basement or foundation (including cracks and bulges)"; and "I am aware of material defects in the plumbing system (including *** [the] sump-pump)." The disclosure report defined the phrase "am aware" to mean "actual notice or actual knowledge without any specific investigation or inquiry." It defined a "material defect" as "a condition that would have a substantial adverse effect on the value of the residential real property or that would significantly impair the health or safety of future occupants of the residential real property." It further clarified: "These disclosures are intended to reflect the current condition of the premises and do not include previous problems, if any, that the seller *reasonably believes* have been corrected." (Emphasis added.)

¶ 6    In October 2013, the Bernfields listed the property for $999,999 and, later, they reduced the list price to $950,000. In May 2014, the parties closed on the sale of the Partridge house, at a price of $835,000. The Manasters never moved into the home. Shortly after the purchase, there was a heavy rain. The Manasters noticed water "gushing" into the basement mechanical room and running over an electrical box. Ultimately, the Manasters determined that repair of the property would be too difficult and costly, and they sold the home at a loss for $575,000.

¶ 7    On September 30, 2016, the Manasters filed the operative complaint in this case, the seven-count, second amended complaint. The first three counts were against the Bernfields: (1) common law fraud (count I); (2) violation of the Residential Real Property Disclosure Act (Disclosure Act) (765 ILCS 77/25 (West 2012)) (count II); and (3) violation of the Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (815 ILCS 505/1 *et seq.* (West 2012)) (count III).

The next four counts were against Coldwell Banker, based on the actions of their agents, the husband-and-wife partners Ira Rumick and Fran Coulter: (1) common law aiding and abetting a fraud (count IV); (2) common law negligence (count VII); (3) violation of the Illinois Real Estate Licensing Act (RELA Act) (225 ILCS 454/15-25 (West 2012)) (count V); and (4) violation of the Consumer Fraud Act (count VI). The common law claims against Coldwell Banker are not at issue on appeal (counts IV and VII).

¶ 8    From October 21 to October 29, 2019, the trial court conducted a combined jury and bench trial, with the jury deciding the common law claims and the court deciding the statutory claims. Seven witnesses testified: Jason and Hillary Manaster, Judith Offerle (the Manasters' realtor), Glen Bernfield, Ira Rumick (the Bernfields' realtor), Armando Arguello (one of the Bernfields' handymen), and David Pasquesi (the Bernfields' plumber). Fran Coulter, the Bernfields' other realtor, did not testify as she had passed away. Numerous documentary, photographic, and video exhibits were submitted into evidence, but they are not included in the record on appeal. Such exhibits include certain e-mail exchanges, market analyses, photographs of alleged water damage, and videos of water infiltration.

¶ 9                     A. Trial: The Manasters' Testimony

¶ 10    Jason and Hillary Manaster testified consistent with one another as follows. The Manasters had been living out-of-state and were looking to return home to Illinois. When visiting family over Thanksgiving in 2013, they viewed the Partridge house with a realtor. Hillary was familiar with the house, because her grandparents had lived on the same street. Even as a child, she had taken note of the house. She loved it. She enjoyed the midcentury architecture. Jason was ambivalent about the house itself, but he liked the area and the lot—a wooded acre on a dead-end street. From the beginning, he planned to remodel the home.

¶ 11    The Manasters viewed the home three times before signing a contract.  During one showing, Hillary noticed a bump or a slope to the kitchen floor.  She pointed it out to Coulter, who told her that the bump was due to normal settling.  This did not cause Hillary to be concerned.  Hillary could see that the home needed some amount of repair, but she loved the home enough to live through a repair-and-renovation period.  Hillary and Jason had no conversations with Coulter or Rumick about the sloped floors in the east wing or water problems in the basement.

¶ 12    On March 16, 2014, the Manasters signed a contract for purchase.  A March 19, 2014, inspection revealed numerous items that needed repair and/or further investigation.  For example, there were gaps and cracks in the bathroom tiling and gaps between the wall and the bathroom sink.  As Jason planned to remodel, the bathroom issues were "minor problems in [his] mind."  More relevant to the instant case, however, the inspection revealed cracks in the front foundation.  The basement walls had stress cracks and the walls had moved.  The contractor recommended that the walls be monitored for future movement.  The contractor had difficulty assessing whether the cracks caused weaknesses in the wall.  One reason that the contractor had difficulty making that assessment was that "storage" had been placed in front of the wall.  The contractor recommended that the walls be evaluated by a structural engineer to discern whether there was a structural problem and, if so, to obtain a bid for repair.  The inspector also recommended that a licensed waterproofing contractor evaluate the property and that the Manasters hire a landscaper to create a proper pitch away from the foundation.  None of these recommendations suggested to Jason that the property was subject to flooding.  Jason did not follow the inspector's recommendations, explaining: "No, the cracks didn't give me any concern."  Jason testified that, if he had known of the water infiltration problem on top of these other issues, he would have followed the inspector's recommendation and hired a structural engineer prior to closing.

¶ 13     A separate, March 21, 2014, inspection of the indoor pool showed that repairing the pool would come at a cost.  The Manasters do not point us to this separate inspection report in the record on appeal.  However, Jason testified to the report as follows:

"A. There was a bunch of different [repair] costs in there, anywhere from $8,000 to $230,000.

Q. Is that what this case is about today?

A. No.

*** 

Q. Are you complaining today about the cost to repair the pool?

A. No, I could be careless.

Q. This was a cost you expected getting a house *** up and running?

A. Yes."

¶ 14     After the inspection(s), the Manasters decided to move forward with the purchase of the home.  They negotiated for a $5000 reduction in light of the inspection report(s).

¶ 15     In May 2014, the Manasters closed on the sale of the home.  Shortly thereafter, on June 11, 2014, Jason noticed a water infiltration problem in the basement.  That day, upon entering the property from the garage, he immediately heard a very loud noise.  He followed the sound to the basement, where he saw a puddle on the floor of the basement's main section.  He then entered the mechanical room and saw a "gusher" or "waterfall" coming out of the wall in approximately two places. The water ran down the wall next to an electrical box.  It ran for hours.  Jason filmed the event.  The video was entered into evidence and shown to the jury.  Jason filmed a similar event on July 23, 2016.  Jason filmed just two gushers in two years, but he believed that five or six gushers had occurred during that time.

¶ 16    In the winter of 2014-2015, Jason forgot to turn off the waterflow to the outdoor spigot. This caused a pipe to burst and led to dry wall damage and "a lot" of water on the floor of one of the mechanical rooms.  (Offerle, the Manaster's realtor, would later testify that Jason's failure to turn off the spigot damaged the ceiling in the pool storage room, as well.)  Jason received a bid to repair the pipe and drywall.  The bid was $1000.  Jason did not repair the damage.  He explained: "I didn't feel like spending $1000, just putting more money into a sinking ship."

¶ 17    Jason testified both to remodeling plans and to repair plans.  As to remodeling plans, the plans evolved from 2014 to 2016.  In total, the Manasters paid the Marvin Herman architectural firm $45,715 for the plans.  A 2014 plan, which included extensive work in the bathrooms, received bids from contractors in the $400,000 to $445,000 range.  A 2016 plan, which by then included bedrooms, a staircase renovation, getting rid of the pool, as well as repair measures, received bids in the $600,000 to $740,000 range.  The Manasters do not point us to the 2016 plans in the record on appeal, and it is not clear what percentage of the $740,000 bid pertained to remodeling, as opposed to repairing, the property.

¶ 18    Jason acknowledged that he did not timely disclose the Marvin Herman plans in conjunction with the instant lawsuit.  In May 2017, the Manasters submitted an affidavit of completeness.  However, they had not disclosed the Marvin Herman plans.  In the summer of 2018, the Bernfields obtained a court order requiring the Manasters to produce all documents by July 5, 2018.  At a July 10, 2018, deposition, the Manasters again failed to disclose the plans.  At some point after July 10, 2018, the Manasters disclosed the plans, which led to a subsequent deposition.

¶ 19    As to repair plans, sometime after closing, the Manasters hired two structural engineers to assess foundational problems and propose repair measures.  The Manasters do not point us to the reports and/or bids in the record on appeal.  The Manasters also hired Pasquesi Plumbing, Perma

Seal, and U.S. Waterproofing to assess the water infiltration problem and provide estimates. David Pasquesi of Pasquesi plumbing rodded the drain and performed exploratory work on the property, including exploration of the pipes in the courtyard. Pasquesi told Jason that he had performed work on the property in the past (for Bernfield). Ultimately, Pasquesi thought that the drain-tile system had failed. He charged $6765 for his work to that point, and he bid $20,000 to $30,000 to put in a new drain tile. Perma Seal and U.S. Waterproofing agreed that a new drain tile was necessary. Their bids were in the $30,000 to $40,000 range. The Manasters did not hire Pasquesi, Perma Seal, or U.S. Waterproofing. They did not have the drain tile replaced.

¶ 20    Around the time that Pasquesi performed exploratory work in the courtyard, the Manasters removed trees in the courtyard on the advice of a landscape architect. However, the tree removal did not alleviate the water infiltration problem. The Manasters never filled in the holes left from digging up trees and exploring the courtyard area. During their two-year ownership of the property, they did not perform any repairs (except, of course, that they allowed Pasquesi to rod the drain).

¶ 21    In 2016, the Manasters decided that it would be too costly to repair the property, and they decided to list the property for sale. At the time they decided to list the property for sale, they had already initiated the instant lawsuit. The Manasters completed a disclosure report in conjunction with the 2016 sale. Unlike Bernfield, they checked "yes" to the various items associated with sloped floors in the east wing and leakage in the basement. They did not disclose any leaks in the pool storage room. Nevertheless, in conjunction with the instant lawsuit, they alleged leaks in the pool storage room and submitted photographs of water running along its perimeter channels.

¶ 22                    B. Trial: Judith Offerle's Testimony

¶ 23    Offerle represented the Manasters in the 2016 sale. She had been contacted by the Manasters' counsel during the pendency of the lawsuit. She had been a realtor since 2003. She also held an engineering degree, though she never practiced as an engineer.

¶ 24    Offerle testified to her professional obligations surrounding the seller's disclosure report. She agreed that it was the seller's, not the realtor's, responsibility to fill out the report. If a seller had a question about how to fill out the report, Offerle would direct the seller to speak with an attorney. If Offerle felt that the seller had been dishonest in filling out the report, she would withdraw as the listing agent.

¶ 25    Offerle performed a market analysis report of the property. The report was submitted into evidence as an exhibit, but the Manasters do not point us to the exhibit in the record on appeal. Offerle testified that she valued the land at between $500,000 and $600,000. She described the trajectory of the real estate market between 2014 and 2016 as "reasonably stable, maybe a little reduction."

¶ 26    Offerle knew that the property needed repairs. Some of the property's flaws were readily apparent. Offerle could see the slope in the floor of the east wing. She could see signs of water damage in the basement, and she had been showed a video of the gusher. Also, a pipe had burst in the ceiling of the pool storage room. She understood that had occurred when Jason forgot to turn off the spigot one winter. She could see that the yard had been dug up and, as a result, the property needed "serious landscaping."

¶ 27    As to the slope in the floor, specifically, she was aware that an addendum to the Manasters' disclosure form stated: "[T]he east side mechanical room has recurring leakage because east bedroom wing, which is slab on grade, has settled." Still, she agreed that older homes "often"

have sloped floors. She further agreed that the most common cause of sloped floors was normal settling.

¶ 28    Finally, Offerle testified to various e-mails that she had written. First, Offerle testified to e-mails that she sent to prospective buyers' agents concerning the cost of repairs. Offerle wanted to provide prospective buyers with a "ball park" figure so as to secure a buyer who could afford to repair the property. She also advised prospective buyers to hire a contractor to better discern the cost of repairs. One e-mail read: "My client is on the advice of their attorney [and] will not disclose the quotes, however, I would estimate $150,000 to $200,000." Another e-mail read: "[W]hile the work [is] not [cost] prohibitive, my clients have been disheartened by the legal process and probably their contentious litigator egging them on and wan[t] to move on." Next, Offerle testified to an e-mail conversation with Jason. At the time, the property was temporarily delisted but they had a lead from a prospective buyer. Offerle encouraged Jason to allow the prospective buyer to view the property. She explained to him that it "would be a good idea if we can get one written offer. It goes a long way *** in convincing a court of damages."

¶ 29                          C. Trial: Glen Bernfield's Testimony

¶ 30    Just prior to Bernfield's testimony, defendants entered the following stipulation concerning the sloped floors in the east wing: "We stipulate to the following facts: prior to offering 2070 Partridge Lane for sale the Bernfields and Coldwell Banker knew about the floors in the hallway and the fourth bedroom, that they were slanted." The parties agree that this stipulation was a consequence of several off-the-record conversations surrounding the trial court's ruling on Coldwell Banker's motion *in limine* to exclude written comments gathered at a broker tour of the property. As is relevant to the instant appeal, one of those comments had read: "Get civil/foundation engineer to assess foundational problem and cost of resolution."

¶ 31    Bernfield testified to his ownership history of the property and to the marketing and sales history of the property. Bernfield owned the home for 28 years. He had many treasured memories of events in the home, including his daughter's engagement party. He reflected: "It was just a wonderful family home for us to both live in and to entertain in." In 2005, however, Sondra became ill, and she and Bernfield decided that it was time to downsize. They listed the property first with realtor Gerry Emefar and, soon after, with Rumick and Coulter. In 2006, Rumick and Coulter listed the property for $1.3 million. The Bernfields received an offer for $1.15 million. They rejected the offer, thinking that it was too low. Bernfield stated: "[It was] [o]ne of the biggest mistakes of my life." After that offer, the market changed, and they removed the listing. In late October 2013, they put the property back on the market. To price the property, they began with the value of the land. Rumick and Coulter had assessed the value of the land at $700,000 to $750,000. They decided to list the property at $999,999, and they later reduced the price to $950,000. In May 2014, they closed on the property with the Manasters for $835,000. During the 2013-2014 marketing of the property, the Bernfields spent the winter in their Arizona home. Also during that time, the Bernfields bought a new, smaller home in Highland Park.

¶ 32    Next, Bernfield testified to his knowledge of the sloped floors in the east wing and the water infiltration problem in the basement. As to the sloped floors, Bernfield first noticed them in 2006, when Rumick and Coulter pointed them out to him. In 2011, Bernfield asked one of his handymen, Richard Plaza, about them. The Manasters objected on hearsay grounds to Bernfield's conversation with Plaza. The court overruled the objection. It provided the jury with a limiting instruction, informing the jury that it was not to consider the conversation for the truth of the words but only for the purpose of showing Bernfield's subsequent conduct. Bernfield continued

testifying to the conversation, relaying that Plaza told him that the sloped floors were the result of ordinary settling.

¶ 33    Bernfield addressed an e-mail exchange between himself and Rumick regarding the sloped floors and prospective buyers named John and Demi (the John and Demi e-mail).  The e-mail exchange was put up on a screen for the jury and portions of it were read aloud.  In the e-mail, Rumick informed Bernfield that John and Demi expressed serious interest in the property, though they were concerned about the sloped floors.  Bernfield had already received an offer from the Manasters at that time, and Rumick advised Bernfield to stick with the Manasters' offer.  Rumick cautioned: "I am concerned about two things.  One, by asking for John and Demi's contract so often I feel like we are giving the impression that we are desperate for another offer as soon as the one we have is falling apart. *** Number two, which of is of more concern to me and of more importance, what if John and Demi have an inspection report that comes up with the structural problems on the slate floor?  This could be quite expensive to take care of properly.  *** We have seen many inspectors find things that others miss and miss things that others find about a house."  Bernfield replied to Rumick that the sloped floors were the result of ordinary settling and that the slope had not gotten worse since they first noticed it in 2006.

¶ 34    Bernfield did not disclose the sloped floors on the disclosure report, because he did not believe them to be a material defect.  Bernfield "took into account" his conversation with Plaza in forming his opinion that the slope was not a material defect.  He also explained: "From our point of view, it wasn't material.  There was a slope but it was slight and it had been the same since we first put the house on the market [in 2006] ***.  In the hallway, it was slightly visible and in my office it was slightly visible ***."  The sloped floors did not interfere with Bernfield's enjoyment

of the home or cause Bernfield any difficulty in navigating the home. Bernfield did not arrange the furniture so as to hide the slope.

¶ 35    As to the water infiltration problem in the basement, Bernfield addressed a 2011 to-do list that he had provided to Plaza. Three items on the list concerned water infiltration in the basement: (1) water near the yarn room; (2) a pooling of water in the main section of the basement's floor; and (3) the "gusher" in the mechanical room that is at the center of this case. As to the water in the yarn room, Bernfield had "no recollection of it," and "[w]hatever it was, it did not persist." As to the pooling of water in the main section of the basement, Bernfield noticed this occasionally after heavy rains. It could be cleaned with five to seven towels. In approximately 2009 or 2010, his prior handyman, Slavic Gos, addressed the problem. Gos removed paneling on the wall and sealed portions of the wall. This solved the problem for some time. As to the gusher, Bernfield did not consider it urgent, because it happened only following heavy rains, two to four times per year. The water then flowed directly into the sump pump. Any remaining water could be mopped up with "less than" one towel. Also, cardboard files stored next to the sump pump were never made wet and unusable. When showed the Manasters' videos of the 2014 and 2016 gushers, Bernfield agreed that they appeared similar in character to the gushers he had experienced. Bernfield did, nevertheless, believe he had repaired the gusher.

¶ 36    In 2013, when Bernfield prepared to put the house on the market, the pooling of water in the main section of the basement had returned to some extent. Additionally, although Bernfield did not consider the gusher to be urgent, "[he] d[id]n't want there to be any leaks for the person who bought [his] house." Thus, Bernfield contacted his plumber of 45 years, David Pasquesi of Pasquesi Plumbing to repair the gusher and the pooling of water in the main section of the basement.

¶ 37    Bernfield began to testify to what Pasquesi told him. The Manasters objected on hearsay grounds to Bernfield's 2013 conversation with Pasquesi. The trial court overruled the objection. It provided the jury with a limiting instruction, informing the jury that it was not to consider the conversation for the truth of the words but only for the purpose of showing the effect of the words on Bernfield.

¶ 38    Bernfield continued that Pasquesi recommended solving the water infiltration problem as follows. Pasquesi would seal cracks in the foundation of an outdoor courtyard referred to as the Japanese garden. Also, Pasquesi would rod out the drain tile to the sump pump in the mechanical storage room. Bernfield personally observed Pasquesi sealing cracks in the courtyard and digging a big hole going down 12 feet to rod out the drain tile. The work was done on two separate days in October 2013. The repairs cost approximately $3000.

¶ 39    Bernfield addressed his discussions with Coulter and/or Rumick about the "gusher" in the mechanical room. Bernfield could not remember whether he told Coulter or Rumick or both about the gusher, but he knew that he told at least one of them. He primarily dealt with Coulter. He told Coulter or Rumick about the gusher after he had repaired it, sometime between October 9 and October 29, 2013. He told them that it had been repaired. He did not discuss it again after that point.

¶ 40    Bernfield also addressed the alleged water incursion in the pool storage room. Although a previous owner had installed drainage channels around the perimeter of the room, Bernfield never experienced any water in that room. "There was never any water there." Bernfield did, however, admit to an occasional leak on the flat portion of the roof. He explained that flat roofs notoriously leak. Bernfield hired a professional to fix each leak as it arose, and it was not an issue at the time of the sale of the house.

¶ 41   Bernfield did not disclose the gusher or any prior leaks on the disclosure report, because he believed they had been repaired. He believed they had been repaired, because he personally observed the repairs. Also, in the seven months between the completion of the disclosure report and the sale of the home, there had been no significant water incursion. Although Bernfield was in Arizona much of that time, one of his handymen, Armando Arguello, checked in on the house two to three times per week. To Bernfield's knowledge, the only post-repair water infiltration of any kind occurred two days before closing. That is, following the heaviest rain in the seven-month period between the October repairs and the May closing, a "trickle" of water could be seen on the chimney. Rumick happened to be at the property that day, and Bernfield "thought" he pointed out the trickle to him. Despite the heavy rain, there was no water flow of any kind, let alone a gusher, in the mechanical storage room.

¶ 42                         D. Trial: Ira Rumick's Testimony

¶ 43   Rumick testified that he, along with Coulter, listed the Partridge house. Rumick has been a realtor since 1979. He has been a member of the Chicago Association of Realtors and of its Professional Standards Committee. He served as a chairman of that committee for two years. He is currently an independent contractor for Coldwell Banker. Although Rumick and Coulter co-listed the property, Coulter did 95% of the work and handled 95% of the communications with clients. Coulter passed away shortly after the closing, in June 2014.

¶ 44   Rumick and Coulter first listed the property in 2006. At that time, Rumick noticed the sloped floors in the east wing. He pointed them out to Bernfield. However, Rumick did not believe they presented a significant problem. Sloped floors were very common in older homes. In fact, he "expected" to see sloped floors in an older home. Sloped floors were usually the result of normal settling, and he had sold many homes with sloped floors. Rumick did not advise Bernfield

to place furniture so as to obscure the slope the floor. The jury was shown pictures from the real estate listing, which showed the placement of the furniture, but the Manasters do not point us to the exhibit containing those pictures.

¶ 45    Rumick, like Offerle, testified that it was the seller's, not the realtor's, responsibility to complete the disclosure report. Rumick was "not allowed" to help the seller complete the report. If Rumick knew that the water problems that had been described at trial existed at the time of the 2014 sale, he would have refused the listing.

¶ 46    Rumick had no recollection of ever being told of any water problem in the basement. He heard Bernfield testify that Bernfield told his realtors of the problem and that the problem had been fixed. However, Rumick did not believe that Bernfield ever told *him* that. If Bernfield told Coulter, Coulter did not pass along the information.

¶ 47    In the seven months that Rumick showed the property, the Bernfields never told Rumick to steer buyers away from certain areas of the house. They never told Rumick that he should not show the house after a heavy rain. Nevertheless, it was true that the Bernfields did not want to allow prospective buyers to perform a formal inspection or appraisal prior to signing a contract. (The contract, in turn, would provide a clause allowing the prospective buyer to walk away pending the results of the inspection.)

¶ 48    The only water Rumick had ever seen in the home was a small leak by the sand filter in the pool room and a small leak resulting in a "few drops" from the flat roof coming in over an interior closet door. Rumick knew that Bernfield had those small leaks repaired. He himself saw men shoveling icy snow off the flat roof in an effort to repair the latter leak.

¶ 49    Finally, Rumick addressed the John and Demi e-mail. He explained: "What I meant [by that e-mail] was you already have one offer on the table, you ought to consider working with that

instead of another one, you never know what is going to happen with another offer." When Rumick wrote the John and Demi e-mail, he did *not* believe that the sloped floors presented a structural problem.

¶ 50                              E. Trial: Armando Arguello's Testimony

¶ 51    Arguello testified that the Bernfields hired him to check on the Partridge house during the winter when they were in Arizona. Arguello checked on the house two to three times per week, and his duties included walking the entire interior and exterior of the property. He checked the main rooms including the kitchen, bathrooms, and basement. He monitored the temperature and the furnace. He went into the mechanical room on every visit. He never saw any water flowing, or even any wetness on the floor, in the mechanical room. Bernfield never asked him to pay special attention to water problems or to watch out for water flow in the mechanical room. Nevertheless, Arguello did generally look for water. He remembered reporting only one small leak to Bernfield. It came from the ceiling over the entryway. The leak was due to snow and ice on the flat roof. Arguello met with a roofer who repaired the leak.

¶ 52                              F. Trial: David Pasquesi's Testimony

¶ 53    Pasquesi testified that he did not recall any specific conversation or job performed for Bernfield: "I remember speaking to Mr. Bernfield in the past but I don't recall what the purpose of our conversation was, and I don't remember the work." In the course of a single year, his company services "thousands" of customers. He relies on his invoices to "sor[t] out exactly what happened."

¶ 54    When given the invoice for the Bernfield project, he explained the work performed. He cleaned out and rodded a drain tile, he replaced a sump pump and two check valves, and he sealed cracks in the courtyard known as the Japanese garden. The drain-tile system includes the piping

underground that collects rainwater. It runs all around the foundation. The purpose of the drain-tile system is to take the drain water that accumulates around the foundation and drain it into the sump pump. The sump pump then pumps the water out. It is very common that a drain tile will crack or get plugged "as time goes on." Most often, it is only necessary to find the "bad spot" and repair that section. Less frequently, the entire drain-tile system must be replaced.

¶ 55    Pasquesi acknowledged that he returned to the Partridge house to perform work for Manaster. However, he did not testify substantively about that work.

¶ 56                                    G. Jury Instructions

¶ 57    At the jury instruction conference, the parties discussed three instructions now at issue on appeal. Those instructions were the Manasters' proposed jury instruction nos. 20, 21, and 13. We first discuss instruction nos. 20 and 21, which were tandem instructions. Instruction no. 20 provided:

> "[20.] When I use the word 'material fact' I mean the statements on the Disclosure Report must have been an essential element to the transaction, and had the Manasters been aware of the truth, they would have acted differently." (Based on IPI Civil No. 800.04. ("Fraud and Deceit—Material Fact—Definition") (approved December 8, 2011).

Instruction no. 21 provided:

> "[21.] A 'material defect' in the context of the Residential Real Property Disclosure Report means that a condition that would have a substantial adverse effect on the value of the residential real property or that would significantly impair the health or safety of future occupants of the residential real property unless the seller reasonably believes that the condition has been corrected." (Non-IPI).

¶ 58    The Manasters explained their position on instruction nos. 20 and 21 as follows. The first element of common law fraud is that the defendant made a false statement of "material *fact*." However, the corresponding IPI instruction defines only the word "material":

> "When I use the word 'material' I mean the [misrepresented] [concealed] [withheld] fact[s] must have been an essential element to the transaction, and had the plaintiff been aware of the truth, he would have acted differently." IPI Civil No. 800.04.

¶ 59    The Manasters' concern was that, if the instructions defined only "material," then the jury would get confused by the terms "material *fact*" versus "material *defect*," the latter of which was a term used in the disclosure report. Thus, as to instruction no. 20, they sought to modify IPI 800.04 to define the term "material fact" instead of just the term "material." They also sought to specifically reference the disclosure report ("When I use the word 'material fact' I mean the statements *on the Disclosure Report* must have been an essential element to the transaction.") (Emphasis added.) As to instruction no. 21, they sought to provide the jury with a definition of "material defect" as it was already defined in the disclosure report. However, they wanted the jury to be able to compare the terms "material fact" and "material defect" side by side.

¶ 60    The court granted Manasters' request in part. As to instruction no. 20, it agreed to modify IPI Civil No. 800.04 to define the term "material fact" instead of just the term "material." However, it declined to further modify the IPI to specifically reference the disclosure report. It also summarily refused non-IPI instruction no. 21, which defined "material defect."

¶ 61    Also at issue was the Manasters' proposed instruction no. 13. Instruction no. 13 read:

> "The phrases 'reasonable belief' or 'reasonably believes' mean that the person concerned, acting as a reasonable person, believes that the described facts exist." (Non-IPI).

¶ 62    The trial court refused instruction no. 13.  It explained that, while the criminal IPI provided a definition for "reasonable belief," the civil IPI did not.  See, *e.g.*, IPI Criminal 4.13 ("Definition of Reasonable Belief") (approved December 8, 2011).  The court agreed with defendants that the term "reasonable belief" was "self-defining" and, therefore, further instruction was not necessary.

¶ 63                    H. Jury Deliberation, Verdict, and Findings

¶ 64    During deliberation, the jury asked five questions, the last four of which are at issue here. First, the jury asked for a demonstrative exhibit prepared by the Manasters setting forth the damages they claimed to have suffered.  The trial court sent back the demonstrative exhibit.

¶ 65    Second, at 12:50 p.m., the jury asked:

> "We have a juror that has a question that is critical (<u>for them</u>) to moving on.  Is the seller responsible to disclose previous problems on the disclosure form which were fixed or not fixed?" (Emphasis in original).

¶ 66    Third, also at 12:50 p.m., the jury asked:

> "We have a juror that has a question that is critical (<u>for them</u>) to moving on.  At the time of filling out the disclosure form, is it legally required by the seller for him to disclose a recent repair that he has not guaranteed that the issue is 100% fixed."  (Emphasis in original).

¶ 67    In response to questions two and three, at 1:41 p.m., the trial court sent back the relevant language of the disclosure report itself.  That language provided:

> "A material defect means a condition that would have a substantial adverse effect on the value of the residential real property or that would significantly impair the health or safety of future occupants of the residential real property unless the seller reasonably believes that the condition has been corrected.

The disclosures are intended to reflect the current conditions of the premises and do not include previous problems, if any, that the seller reasonably believes have been corrected."

All parties agreed to this answer.

¶ 68    Fourth, at 2:43 p.m., the jury asked: "May I, the foreperson, speak to the judge?"  In response to question four, at 3:05 p.m., the trial court answered: "No, the judge cannot speak individually with jurors."

¶ 69    In discussing question four, counsel for Coldwell Banker had suggested giving the *Prim* instruction for deadlocked juries.  Counsel for the Manasters and the Bernfields suggested holding off, noting that the jury had not officially declared deadlock.  The trial court noted that the jury had been deliberating for over ten hours across two days.  Still, it agreed that "at this point I do believe [a *Prim* instruction is] a bit premature."

¶ 70    Fifth, at 3:14 p.m., the jury asked:

"We are having an issue in the deliberation room. We are currently 11-1 (not indicating one way or another).  The 12th juror is firm in his/her belief and will not entertain further discussion. He/she wants to dismiss the case. We as a jury do not want a hung jury."

Upon receiving question five, the trial court asked counsel:

"[THE COURT]: Have counsel had an opportunity to consider what response, if any, would be appropriate from the court at this time?

[MANASTERS' COUNSEL]: Yes.  This appears to be the predicate for the *Prim* charge."

Counsel for defendants agreed.

¶ 71    Thus, at 3:24 p.m., court called the jury into the courtroom and read it the *Prim* instruction, reminding them that "[it was their] duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if [they] c[ould] do so without violence to individual judgment." Although the exact timing is not clear from the record, "shortly thereafter" and "within minutes" of receiving the *Prim* instruction, the jury returned a verdict for defendants on each of the common law claims before it. Later, the trial court also found for defendants on each of the statutory claims before it. The trial court denied the Manasters' posttrial motion. This appeal followed.

¶ 72                                   II. ANALYSIS

¶ 73    As a threshold matter, the Manasters challenge two of the trial court's evidentiary rulings as well as its choice of jury instructions. The Manasters next argue that the following judgments in favor of defendants were against the manifest weight of the evidence: (1) common law fraud as to the Bernfields (count I); (2) an alleged violation of the Disclosure Act as to the Bernfields (count II); (3) an alleged violation of the RELA Act as to Coldwell Banker (count V); and (4) an alleged violation of the Consumer Fraud Act as to Coldwell Banker (count VI). They also argue that the trial court erred in determining that the Consumer Fraud Act did not apply to the Bernfields (count III).[2] We reject these arguments.

¶ 74                 A. Evidentiary Rulings and Choice of Jury Instructions

_____

[2] The Manasters initially appealed the jury and bench trial judgments as to all seven claims. However, in their reply brief, the Manasters withdrew their challenge as to the two common law claims against Coldwell Banker, aiding and abetting common law fraud (count IV) and negligence (count VII).

¶ 75    The Manasters argue that the trial court erred by: (1) granting Coldwell Banker's motion *in limine* to exclude a comment from an unnamed broker at the broker tour pertaining to the sloped floors in the east wing ("Get civil/foundation engineer to assess foundational problem and cost of resolution"); and (2) allowing Bernfield to testify to hearsay statements by handyman Plaza and plumber Pasquesi.  They also argue that the trial court erred in refusing their proposed non-IPI jury instruction nos. 21 and 13, which defined "material defect" and "reasonable belief" and, separately, by issuing the *Prim* instruction.  They contend that, had the trial court decided differently in these instances, the outcome of the trial would have been different.

¶ 76    We review these matters for an abuse of discretion.  See *Swick v. Liautaud*, 169 Ill. 2d 504, 521 (1996) (motion *in limine*); *Gill v. Foster*, 157 Ill. 2d 304, 312-13 (1993) (admitting evidence in general); and *Schultz v. Northeast Illinois Regional Commuter Railroad Corp.*, 201 Ill. 2d 260, 273 (2002) (jury instructions); *People v. Chapman*, 194 Ill. 2d 186, 222 (2000) (*Prim* instruction).  A trial court abuses its discretion when its ruling is arbitrary, fanciful, or unreasonable, or when no reasonable person would adopt the court's view.  *Enbridge Pipelines (Illinois), LLC v. Troyer*, 2015 IL App (4th) 150334, ¶ 14.  For the reasons that follow, the Manasters cannot show that the trial court abused its discretion in any of the challenged evidentiary and jury-instruction matters.

¶ 77                                    1. Motion *in Limine*

¶ 78    The Manasters' argument ignores the history and context for the trial court's ruling on the motion *in limine* which we now recount in more detail.  That is, the court initially denied the motion, writing: "Coldwell Banker's Motion *in limine* to Bar Hearsay Evidence is denied, but such documents *may be admitted only to show notice*, not for the truth of the matter asserted." (Emphasis added.)

¶ 79    Subsequently, at trial, defendants stipulated to notice: "We stipulate to the following facts: prior to offering 2070 Partridge Lane for sale the Bernfields and Coldwell Banker knew about the floors in the hallway and the fourth bedroom, that they were slanted." As a result, the trial court reversed its ruling on the motion *in limine*. The reversal was made off the record. However, counsel for the Manasters later recounted the ruling on the record as follows:

> "Judge, in looking everything over I noticed *** the written order that *** denied Coldwell Banker's motion *in limine* *** relative to the hearsay evidence. There [were] then *several discussions, which I believe were off the record, and the result of that was an agreed stipulation which has been accepted*. But I'm not sure that there is a formal record that the court had reconsidered over the course of the trial its denial of Coldwell Banker's motion *in limine* to bar hearsay evidence. What the court—what I think the result of an off the record discussion was [that] the court had revisited that motion *in limine*, had granted it subject to the stipulation and without the plaintiff's waiver of its objection. I just want to [put] that [on] the record." (Emphasis added.)

¶ 80    At trial, the Manasters made an oral motion to reconsider the trial court's ruling. The court denied the motion: "We've already stipulated they were aware of the floor issue. That's why we resolved the motion *in limine* in that fashion. We've already got a stipulation that both Coldwell Banker and the Bernfields knew of the slanted floor prior to the time of—or at the time of the listing and sale. What more do you want?"

¶ 81    Here, the court appears to have acted within its discretion to manage the admission of evidence, balance competing interests, and weigh probative value versus prejudicial effect. See, *e.g.*, Evid. Rule 403 (eff. Jan. 1, 2011). The stipulation informed the jury that defendants had notice of the sloped floors. As notice had been the only purpose for which the court had initially

allowed the broker's statement, the broker's statement was no longer necessary. Moreover, by excluding the feedback from the unnamed broker, the court ensured that the jury would not accept the broker's words as true, *i.e.*, that the floors in fact represented a structural problem. "Any doubts which may arise from the incompleteness of the record will be resolved against the appellant." *Foutch v. O'Bryant*, 99 Ill. 2d 389, 392 (1984). As such, on this record, we see no legitimate basis for the Manasters' challenge to the trial court's ruling.

¶ 82　　　　　　　　2. Alleged Hearsay Statements of Plaza and Pasquesi

¶ 83　　As to Bernfield's testimony concerning his conversations with Plaza and Pasquesi, it was not hearsay. "Hearsay evidence, an out-of-court statement offered to prove the truth of the matter asserted, is generally inadmissible unless an exception applies." *Piser v. State Farm Mutual Auto Insurance Co.*, 405 Ill. App. 3d 341, 351 (2010); see also Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). However, testimony about an out-of-court statement that is used for a purpose other than to prove the truth of the matter asserted is not hearsay. *In re Zariyah A.*, 2017 IL App (1st) 170971, ¶ 88. For example, testimony about an out-of-court statement that is offered to show the effect on the listener or explain the listener's course of conduct is not hearsay. *Id.* That was precisely the reason given here.

¶ 84　　The court allowed Bernfield to testify to his conversation with Plaza to show why he told Rumick in the John and Demi e-mail that the sloped floors were due to normal settling and why he completed the disclosure report as he did. Similarly, the court allowed Bernfield to testify to his conversation with Pasquesi to show why he believed that Pasquesi's work corrected the water infiltration problem and, again, why he completed the disclosure report as he did. The court provided the jury with a limiting instruction, informing it that it was not to consider Bernfield's testimony for the truth of the matter asserted but rather for its effect on the listener. The trial court

did not abuse its discretion in allowing Bernfield to testify to his conversations with Plaza and Pasquesi.

¶ 85                                3. Jury Instructions

¶ 86    The Manasters argue that the trial court should have issued its proposed non-IPI instruction nos. 21 and 13 defining "material defect" and "reasonable belief." The applicable civil IPI instructions shall be given unless the trial court determines that they do not accurately state the law. Illinois Supreme Court Rule 239(a) (eff. Apr. 8, 2013); *Parikh v. Gilchrist*, 2017 IL App (1st) 160532, ¶ 33. Non-IPI instructions may be given if the IPI instruction does not accurately state the law or does not cover a subject on which the jury should be instructed. *Id.* The trial court's decision to give or refuse a proposed non-IPI instruction will not be reversed absent an abuse of discretion. *Parikh*, 2017 IL App (1st) 160532, ¶33.

¶ 87    We first address instruction No. 21, which defined the term "material defect." The trial court's evaluation of instruction No. 21 was linked to its evaluation of instruction No. 20, which defined "material." Although the court refused instruction No. 21, it nevertheless accounted for the Manasters' concern that the jury would confuse the concepts of "material fact" and "material defect" by adding the term "material fact" to instruction No. 20. This approach allowed the trial court to closely track the standard IPI language in instruction No. 20. See *Parikh*, 2017 IL App (1st) 160532, ¶33. Moreover, the jury *was* ultimately provided with the definition of "material defect." In answer to jury questions two and three, the court instructed in pertinent part: "A material defect means a condition that would have a substantial adverse effect on the value of the residential real property or that would significantly impair the health or safety of future occupants of the residential real property unless the seller reasonably believes that the condition has been corrected." This language came from the disclosure report and was nearly identical to the

Manasters' proposed instruction no. 21. The Manasters agreed to the instruction. The court did not abuse its discretion in first addressing the Manasters' concern in a manner that allowed it to closely track the IPI language and then, upon receiving a question from the jury, in issuing an instruction agreed to by all parties.

¶ 88    We next address instruction no. 13, which defined "reasonable belief." The trial court may refuse to define a term in a jury instruction that is self-defining or commonly understood. *Parikh*, 2017 IL App (1st) 160532, ¶ 34. Here, although the IPI Criminal defines reasonable belief, the IPI Civil does not. In our view, the term "reasonable belief" is self-defining and commonly understood. Thus, we cannot say that the court's refusal to define it was an abuse of discretion.

¶ 89                                    4. *Prim*

¶ 90    The Manasters have forfeited their challenge to the trial court's issuance of the *Prim* instruction. "A [litigant] forfeits review of a jury-instruction error if he did not object to the instruction or offer an alternative instruction." *In re James W.*, 2014 IL App (5th) 110495, ¶ 23. Here, after jury question four, Coldwell Banker suggested that the court give the jury the *Prim* instruction. The Manasters objected. However, after jury question five, the Manasters agreed with the trial court that the time was right—after more than 10 hours of deliberation over two days and a declaration of deadlock—to give the *Prim* instruction. When prompted by the court, the Manasters' counsel answered: "This appears to be the predicate for the *Prim* charge." Because the Manasters' counsel withdrew the objection to the *Prim* instruction, even agreeing with the court that the time was right to give it, this argument is forfeited.

¶ 91    Forfeiture aside, there was no error. The purpose of a *Prim* instruction is to give guidance to a jury that is not hopelessly deadlocked. *People v. Gregory*, 184 Ill. App. 3d 676, 681 (1989). In deciding to give a *Prim* instruction, the trial court may consider the length of time already spent

deliberating and the complexity of the issues before the jury. *Chapman*, 194 Ill. 2d at 222. Here, as stated, the Manasters agreed to give the *Prim* instruction after a lengthy deliberation. They now complain, however, that the return of the jury verdict shortly after the issuance of the *Prim* instructions shows that the jury was coerced. However, the length of time a jury spends deliberating is not, on its own, determinative of whether a trial court exerted pressure on the jury to reach a verdict. *Gregory*, 184 Ill. App. 3d at 682. In point of fact, in *Prim* itself, the court was found not to have hastened the verdict, even though the jury deliberated for just 15 minutes after receiving the instruction. *Prim*, 53 Ill. 2d at 71-72. We reject the Manasters' argument.

¶ 92          B. The Judgments Were Not Against the Manifest Weight of the Evidence

¶ 93     The Manasters argue that the following judgments in favor of defendants were against the manifest weight of the evidence: (1) common law fraud as to the Bernfields (count I); (2) an alleged violation of the Disclosure Act as the Bernfields (count II); (3) an alleged violation of the RELA Act as to Coldwell Banker (count V); and (4) an alleged violation of the Consumer Fraud Act as to Coldwell Banker (count VI). The four claims at issue share common questions of fact. On this point, it is important to remember that it is the trier of fact's role to resolve the conflicts in the evidence, assess the credibility of the witnesses, and to decide what weight is to be given to the witnesses' testimony. *Maple v. Gustafson*, 151 Ill. 2d 445, 452 (1992). A litigant is entitled to a new trial when the verdict or finding is against the manifest weight of the evidence. *Id*. at 454. A verdict or finding is against the manifest weight of the evidence where the opposite conclusion is clearly apparent or where the findings of the jury are unreasonable, arbitrary, and not based on the evidence. *Id*. In this case, we are also mindful that the record on appeal does not include the many of the exhibits that were shown to the jury. Again, we will resolve any doubts due to the incompleteness of the record against the appellant. *Foutch*, 99 Ill. 2d at 392.

¶ 94                           1. Common Law Fraud Against the Bernfields (Count I)

¶ 95     The elements of common-law fraud are: (1) a false statement of material fact; (2) knowledge or belief by the defendant that the statement was false; (3) an intention to induce the plaintiff to act; (4) reasonable reliance upon the truth of the statement by the plaintiff; and (5) damage to the plaintiff resulting from this reliance. *Avon Hardware, Co. v. Ace Hardware Corp.*, 2013 IL App (1st) 130750, ¶ 15. Here, as to the sloped floors in the east wing, the Manasters' argument on appeal cannot survive the first element. As to the water infiltration problem, the Manasters' argument cannot survive the second.

¶ 96     We first address the sloped floors. The Manasters contend that Bernfield made a false statement of material fact when he checked "no" to the following statements on the disclosure report: "I am aware of material defects in the walls or floors"; and "I am aware of material defects in the basement or foundation (including cracks and bulges)." Again, the disclosure report defined a material defect as "a condition that would have a substantial adverse effect on the value of the residential real property or that would significantly impair the health or safety of future occupants of the residential real property unless the seller reasonably believes that the condition has been corrected." The Manasters reason that, because Bernfield admitted to being aware of the sloped floors, he should have known that there were material defects in the floors and foundation.

¶ 97     However, the jury was not required to find that the sloped floors constituted a material defect or that they were a sign of a material structural problem. Most critically, the evidence showed that, after the closing, the Manasters hired two structural engineers to assess the foundation. Yet, the Manasters submitted no testimony by the structural engineers to establish that they actually found structural defects or that the sloped floors were related to a structural defect. Even on appeal, the Manasters point to no evidence at trial to support their claim that the sloped

floors represented a structural defect and merely state in conclusory fashion: "[T]he only inference that can be drawn from the evidence is that the sloping floors and the gushers *** in the area just below the sloping floors were *** related problems."

¶ 98    Contrary to the Manasters' position, the evidence at trial showed that sloping floors are a common feature in older homes. Rumick and Offerle both agreed to that. Bernfield had been aware of the slope in the floors since 2006, and, in his view, the slope had not gotten worse since then. It was undisputed that the slope did not interfere with Bernfield's enjoyment of the home or give him difficulty in navigating the home. The Manasters did not present any contrary evidence. Thus, it cannot be said that the slope would "significantly impair the health or safety of future occupants of the residential real property."

¶ 99    We next address the water infiltration problem and, more specifically, the gusher in the mechanical room. The Manasters contend that Bernfield made a false statement of material fact *and* believed the statement to be false when he checked "no" to the following statements on the disclosure form: "I am aware of flooding or recurring leakage problems in the crawlspace or basement"; "I am aware of material defects in the basement or foundation (including cracks and bulges)"; and "I am aware of material defects in the plumbing system (including *** [the] sump-pump)." The Manasters acknowledge that, per the disclosure report's own terms, "Th[e] disclosures are intended to reflect the current condition of the premises and do not include previous problems, if any, that the seller *reasonably believes* have been corrected." (Emphasis added.) The Manasters urge, however, that Bernfield cannot have reasonably believed that he corrected the flooding and recurring leakage problems in the basement. They assert that the nature of the problem was extensive and note that, in comparison, the repair cost was low. They further contend that the Bernfields attempted to camouflage the problem by putting storage units in the basement.

¶ 100   We disagree.  Whether Bernfield reasonably believed that the water infiltration problem had been fixed was largely a question of credibility.  Credibility determinations are within the province of the jury.  See *Maple*, 151 Ill. 2d at 452.  Here, the jury could have reasonably found that Bernfield testified credibly that he believed the problem to be fixed.  Bernfield hired Pasquesi, his plumber of 45 years, to solve the problem.  He personally observed Pasquesi sealing cracks in the outdoor courtyard and rodding the drain tile.  In the seven months between the repairs and the closing, during which one heavy rain occurred, the gusher did not return.  While Bernfield agreed that the gushers that he had experienced were similar in character to the two that Jason filmed, Bernfield did not characterize the gusher as a serious problem.  According to Bernfield, the gusher occurred only two to four times per year, flowed immediately into the sump pump, and any remaining water could be wiped up with a single towel.  The cardboard files that were stored near the gusher never were damaged.

¶ 101   Bernfield's testimony was directly corroborated by Pasquesi and Arguello and indirectly corroborated by Rumick.  After looking at the invoice, Pasquesi confirmed that the work was performed.  Pasquesi testified that, most often, it is only necessary to repair the "bad spot" in a drain-tile system.  Eventually, however, the entire drain-tile system will need to be replaced, leading to a more costly repair.  That the need for this more costly repair occurred during the Manasters' ownership does not mean that Bernfield did not reasonably believe he had corrected the problem as recommended by his plumber.  Arguello, who visited the home two to three times per week over the seven months at issue, confirmed that there were no signs of significant water incursion.  Also, Rumick testified that Bernfield never instructed him to steer buyers away from certain areas of the home or avoid showing the home after heavy rains.

¶ 102   The Manasters' testimony, in turn, contained multiple inconsistencies.  The jury was not required to believe that the water infiltration problems were as widespread as the Manasters claimed.  For example, Bernfield insisted that he never had any water in the pool storage room and the Manasters themselves did not disclose water in the pool storage room in their own 2016 disclosure report.  Further, to the extent that there was water damage in the pool storage room, the jury could have found that the Manasters themselves caused the damage.  Jason caused a pipe to burst and declined to repair the pipe or the drywall damage and Offerle testified that the ceiling of the pool storage room had been damaged in the event.  Further, Jason's testimony concerning repair costs likely puzzled the jury.  On the one hand, in 2014 heading into the purchase, Jason was not concerned with whether the repair costs for pool would be $8000 or $230,000 ("I could be careless") and, in 2015-2016, Jason continued to commission his architect to draw plans for a remodel (with the plans alone costing $45,000 and bids for the earliest, simplest plans coming in at over $400,000).  Yet, on the other hand, during the winter of 2014-2015, Jason did not want to spend even $1000 to repair a pipe that he caused to burst ("I did not want to throw money into a sinking ship").  The jury may have reasonably discounted the Manasters' testimony.

¶ 103   Considering the above testimony in favor of the Bernfields, the jury's finding as to the common law fraud claim was not against the manifest weight of the evidence.  We note that, as to this common law fraud claim only, the Manasters also argue that they were entitled to a judgment notwithstanding the verdict (JNOV).  However, the standard required to obtain a JNOV is higher than that required to obtain a new trial.  See, *e.g.*, *Maple*, 151 Ill. 2d at 453 (the standard for a JNOV is more "conclusive" than the standard for a new trial).  As we have determined that the Manasters are not entitled to a new trial, we also determine that they are not entitled to a JNOV.  We affirm the trial court's judgment as to count I.

¶ 104      2. An Alleged Violation of the Disclosure Act Against the Bernfields (Count II)

¶ 105   The Disclosure Act requires a seller to disclose a material defect of which he had actual knowledge. 765 ILCS 77/25(b) (West 2012). However, the seller has no obligation to conduct an investigation to complete the disclosure report. 765 ILCS 77/25(c) (West 2012). Moreover, the seller is not liable for any error, inaccuracy, or omission if the seller reasonably believed the material defect to have been corrected. 725 ILCS 77/25(a) (West 2012).

¶ 106   The Manasters' claim under the Disclosure Act largely mirrors their claim for common law fraud. Indeed, the Manasters all but concede in their appellate brief that our resolution of count II will rise and fall with our resolution of count I. They state: "[T]he jury's resolution of [c]ount I (*and the trial court's resolution of [c]ount II ***) turned on whether Glen Bernfield's purported 'belief' that these material defects had been repaired was 'reasonable'.*" (Emphasis added.) We have already determined a trier of fact could have found that the sloped floors did not constitute a material defect and that Bernfield reasonably believed the water infiltration problem to have been corrected. As such, we affirm the trial court's judgment as to count II.

¶ 107      3. An Alleged Violation of the RELA Act against Coldwell Banker (Count V)

¶ 108   The Real Estate Licensing Act provides:

> "Licensees shall treat all customers honestly and shall not negligently or knowingly give them false information. A licensee engaged by a seller client shall timely disclose to customers who are prospective buyers all latent *material* adverse facts pertaining to the physical condition of the property that are *actually known* by the licensee and that could not be discovered by a reasonably diligent inspection of the property by the customer. A licensee shall not be liable to a customer for providing false information to the customer if the false information was provided to the licensee by the licensee's client and the licensee

did not have actual knowledge that the information was false. No cause of action shall arise on behalf of any person against a licensee for revealing information in compliance with this Section." (Emphases added.) 725 ILCS 454/15-25 (West 2012).

¶ 109 The Manasters' RELA Act argument on appeal focuses solely on the sloped floors in the east wing, not the water infiltration problem. The Manasters argue that Rumick violated the RELA Act in that he was aware of the sloped floors in the east wing and was aware that some inspectors would discover the defect but others would not. As Rumick wrote in the John and Demi e-mail: "[W]hat if John and Demi have an inspection report that comes up with the structural problems on the slate floor? This could be quite expensive to take care of properly. *** We have seen many inspectors find things that others miss and miss things that others find about a house."

¶ 110 The Manasters' argument fails for at least two reasons. First, as we have discussed, the Manasters never proved that the sloped floors constituted a *material* defect resulting in damages. Again, although the Manasters hired two structural engineers to assess the foundation, they submitted no testimony that the structural engineers actually found material structural defects or that the sloped floors were related to a structural defect. Stated otherwise, the Manasters never proved that the sloped floors were the result of anything other than normal settling.

¶ 111 Second, even if the sloped floors did constitute a material defect, the Manasters never proved that Rumick *actually knew* that they did. Rumick testified that, at the time he wrote the John and Demi e-mail, he did not believe that the sloped floors represented a structural defect. He simply did not want to take the chance another inspector might conclude differently. Rumick's explanation for the John and Demi e-mail presents a credibility issue, and we will not upset the trial court's credibility determination. See, *e.g.*, *Maple*, 151 Ill. 2d at 452. As such, we affirm the trial court's judgment as to count V.

¶ 112    4. An Alleged Violation of the Consumer Fraud Act against Coldwell Banker (Count VI)

¶ 113    To prove a violation of the Consumer Fraud Act, a plaintiff must show: (1) a deceptive act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deception; (3) the occurrence of the deception in the course of conduct involving trade and commerce; and (4) actual damage to the plaintiff (5) proximately caused by the deception. *Capiccioni v. Brennan Naperville, Inc.*, 339 Ill. App. 3d 927, 933 (2003).  The Consumer Fraud Act applies to realtors if the realtor "knows of the false, misleading or deceptive character of such information."  815 ILCS 505/10b(4) (West 2012).

¶ 114    The Manasters' Consumer Fraud Act argument on appeal focuses primarily on the sloped floors and only cursorily on the water infiltration problem.  The Manasters contend that Coulter and Rumick had actual knowledge that the information contained in Bernfield's disclosure report was false.  Specifically, they contend:

> "Mr. Rumick knew that the condition of the flooring was likely to be detected by some but not all inspectors, conceding that the disclosure report was deceptive.
>
> Indeed, [the John and Demi] e-mail demonstrates conclusively that [Rumick] knew that representations regarding the condition of the floor and foundation *** were misleading and/or deceptive."

¶ 115    We reject the Manasters' argument.  The Manasters' argument fails for the same reason it failed when presented as a RELA Act claim.  That is, the Manasters never proved that the sloped floors were not the result of ordinary settling.  Also, the Manasters never proved that Coulter or Rumick *knew* the sloped floors were not the result of ordinary settling.

¶ 116    As to the water infiltration problem, the Manasters argue in total: "Glen Bernfield testified that he told Ms. Coulter and/or Mr. Rumick that he had substantial water leakage in the basement

which he addressed within two weeks of listing the house for sale." This argument, however, is otherwise undeveloped. The Manasters fail to argue that Coulter and Rumick had any reason to believe that the water problem was *not* fixed. In any event, the evidence supported the trial court's determination that Rumick did not know of any *current* water problems. Rumick testified that the only water he had seen in the home was a small leak coming from the roof and a small leak near the sand filter of the pool. He believed that both of these leaks had been fixed. Rumick's testimony was corroborated by Arguello, who testified that the small leak on the roof had been fixed. As we have stated throughout this order, we will not disrupt the trial court's credibility determinations. As such, we affirm the trial court's judgment as to count VI.

¶ 117        C. Application of the Consumer Fraud Act to the Bernfields (Count III)

¶ 118   Finally, the Manasters argue that the trial court erred in determining that the Bernfields could not be liable under the Consumer Fraud Act. The Manasters accept that, typically, homeowners involved in the sale of their personal residence are not engaged in "trade or commerce" and cannot, therefore, be liable under the Consumer Fraud Act. *Provenzale v. Forister*, 318 Ill. App. 3d 869, 877 (2001); *Zimmerman v. Northfield Real Estate, Inc.*, 156 Ill. App. 3d 154, 168 (1986). The Manasters note, however, that persons who purchase multiple homes for the purposes of renovation and resale can be liable under the Act. *Pack v. Maslikiewicz*, 2019 IL App (1st) 182447, ¶ 118 (the seller bought the residence for the purpose of renovating and reselling at a profit, she purchased several other homes for the same purpose, and she never resided in the homes). The trial court's determination that the Bernfields were not involved in the purchase of multiple homes for the purposes of renovation and resale is one of fact. We defer to the court's factual determination unless it was against the manifest weight of the evidence. See, *e.g.*, *Curtis Investment Firm Ltd. Partnership v. Schuch*, 321 Ill. App. 3d 197, 201 (2001).

¶ 119   Here, the trial court's determination was not against the manifest weight of the evidence. To be sure, the Bernfields held three properties at the same time for a number of months—the Partridge house (their primary residence of 28 years), the new house in Highland Park (their "downsizing" residence, which they bought while the Partridge house was still on the market), and the Arizona house (their "snowbird" residence). However, this did not mean that the Bernfields' sale of the Partridge house was anything more than the sale of their personal residence. As Bernfield testified, the Partridge house had been a "wonderful family home." They hosted many family events there over 28 years, including their daughter's engagement party. Unlike the situation in *Pack*, the Bernfields resided in the Partridge house. Moreover, the evidence overwhelmingly supports that they did not purchase the Partridge house—in 1986—for the purpose of renovating and reselling it. The Manasters' argument as to count III is without merit.

¶ 120                                    III. CONCLUSION

¶ 121   For the reasons stated, we affirm the judgment of the trial court of Lake County.

¶ 122   Affirmed.